Robert N. GOLUBIN, Appellant,

v.

UNITED STATES of America, Appellee.

No. 9495.

United States Court of Appeals Tenth Circuit.

April 22, 1968.

F. Lee Bailey, Boston, Mass., for appellant.

John Quinn, U. S. Atty. (John A. Babington, Asst. U. S. Atty., was with him on the brief), for appellee.

Before MURRAH, Chief Judge, MARVIN JONES*, Judge, Court of Claims, and BREITENSTEIN, Circuit Judge.

BREITENSTEIN, Circuit Judge.

Appellant-defendant Golubin and two others, Walker and Allen, were charged in a 26-count indictment with the use of the mails to defraud in violation of 18 U.S.C. § 1341. The case was first tried to a jury which failed to agree and was discharged. The court thereafter entered a judgment of acquittal as to Allen. The government later dismissed the charges against Walker. Golubin waived a jury, and on trial to the court was convicted of 16 counts and sentenced to concurrent 3-year terms.

The charges stemmed from the sale of land in Taos County, New Mexico. Great Southwestern Land Company acquired several sections of land at an average price of about $25 per acre. The land was located near the village of Tres Piedras, New Mexico, in a remote area. It was largely barren and arid, without the usual utilities, and of limited accessibility. The land was plotted into three subdivisions, Tres Piedras Estates, Carson Estates, and Ranchos de Taos Estates. The tracts were a quarter to a half acre in size.

The Land Company set up booths at various shows, fairs, and exhibitions. The public was induced to register for a purported drawing of free lots. The registrations were culled to eliminate the young, the old, and those who might be near neighbors. After the culling, letters were sent to all remaining registrants by certified mail notifying them that they had won a free lot and could obtain a deed by sending the amount of the closing costs. These were $49.30 for Tres Piedras Estates and Carson Estates, and $52.50 for Ranchos de Taos Estates. If the recipient responded by paying the requested amount, he was then visited by a salesman and urged to

buy additional tracts. In all, about 26,000 lots were sold to about 10,000 purchasers. The use of the mails and the management and operation of the Land Company were stipulated. Defendant was president of the company.

Defendant has filed a transcript of the evidence received in the first trial and insists that his motion for acquittal in that trial should have been sustained because of insufficiency of the evidence. His argument of this point consists of a prolix and complicated narration of the evidence which is followed by a request that we sift the record and make an independent determination of its sufficiency. We respectfully decline to do so. Defendant fails to point out any significant difference between the evidence at the first trial and the evidence at the second trial. We have examined in detail the record of the second trial and, as later noted, conclude that it sustains the conviction. The burden is on the defendant to show a substantial difference. He does not discharge that burden by bald assertions. Without a substantial difference, the conviction by the court in the second trial, which we uphold, establishes that in the first trial the evidence was sufficient to require submission to the jury.

Defendant says that the second trial subjected him to double jeopardy in violation of the Fifth Amendment but he cites no authorities to support his contention. The issue was not raised in, or considered by, the district court. We have expressly disapproved the practice of withholding an objection until after determination of guilt.[1] The first trial failed to dispose of the case because of the disagreement of the jury. In Hunter v. Wade, 10 Cir., 169 F.2d 973, 975, aff'd 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974, we held that where a jury fails to agree upon a verdict, the constitutional guaranty against double jeopardy does not bar a subsequent

---

*Sitting by designation.

1. See Mares v. United States, 10 Cir., 383 F.2d 805, 808; and Ladakis v. United States, 10 Cir., 283 F.2d 141, 143.

trial. This accords with the principles announced by the Supreme Court in Gori v. United States, 367 U.S. 364, 367–368, 81 S.Ct. 1523, 6 L.Ed.2d 901, and in United States v. Tateo, 377 U.S. 463, 465–466, 84 S.Ct. 1587, 12 L.Ed.2d 448. Retrial was proper because the first trial was a nullity—not an acquittal.

 The attack on the sufficiency of the evidence is based on the generalization that the record shows no more than good faith participation in a legitimate business venture. This issue was for determination by the finder of the facts.[2] The controlling facts are not seriously disputed. The question is intent and it may be inferred "from the conduct of the defendants, and circumstantial evidence, upon which reasonable inferences may be based."[3] We have rejected the concept that when the evidence is circumstantial, it must exclude every reasonable hypothesis other than that of guilt.[4]

The defendant developed the methods which were used and supervised the operations thereunder. The registration booths were prepared so as to give the impression that a free lot would be awarded after the drawing. In some instances a drawing was held to determine who was entitled to a free poodle—but not who was entitled to a lot. The registrants who survived the culling to eliminate unlikely or undesirable prospects all received a letter sent by certified mail announcing their award. Enclosed was the registration on which was originally stamped "Winner—Judges Decision Final." After complaint by authorities of the State of Washington this was changed to read "Advertising Award." The letter said that acceptance of the offer must be made in 10 days and that a deed would issue upon receipt of the costs. Some letters stated that the costs included "surveying, staking, road building, deed preparation, etc." Others said that the cost total was "made up of $41.25 for a physical survey and staking to provide a legal description, $7.50 for deed preparation and handling and $0.55 to cover the cost of the necessary federal documentary stamps."

In practice no attention was paid to the 10-day limitation. A cost breakdown by the company accountant during a period of one year in which 11,293 lots were awarded showed a cost per lot of $3.721 for surveying. Other costs included:

Advertising ................$ 1.098
Automotive and Travel ....... 1.897
Commissions ............... 19.182
Legal and Accounting ........ 1.147
Office Supplies, Postage and
 Printing ............... 6.802
Rent ...................... 1.134
Road Construction and Main-
 tenance ................. 2.635
Salaries and Wages .......... 6.041 [5]

The district court reasonably concluded that the representation of costs ·was false, was known to be false, and was intended to deceive.

The district court found other misrepresentations in regard to the availability of water, electricity, and phone service. Of these, only water need be mentioned. The early literature of the company contained the statement: "It is our understanding that water can be obtained at approximately seventy-five feet." An expert testified that the estates were on a lava flow covered by a few feet of fill and that a dependable water supply could be obtained only by drilling 400–700 feet to the permanent water table. There is evidence that the defendant knew of the water situation and, at the insistence of his original co-

---

2. Wall v. United States, 10 Cir., 384 F.2d 758, 761–762.

3. Id. at 762.

4. Id.

5. The total cost per lot was shown to be $51.842. These costs were computed on the basis of the give-away lots and did not consider the lots purchased at higher prices. After receiving this cost study, the defendant fixed the price for the give-away lots on the Ranchos de Taos subdivision at $52.50 per lot.

defendant Walker, changed the statement on water to read: "Water is obtained by private well; however, there are concrete plans for a public water system to be completed in the foreseeable future." We are convinced that the trial court correctly concluded that the representations on water were not made in good faith but were designed to give a false impression that water was feasible at an economically practical cost by a private well.

On June 4, 1962, the Real Estate Commission of the State of California issued a cease and desist order against the Land Company. At the time it had about 30,000 leads obtained from booth operations. To utilize the leads, defendant organized a new company, New Mexico Southwest Development Company, with dummy officers and through it disposed of 1500–1600 lots in the Ranchos de Taos Estates utilizing the methods developed for the Land Company.

The defendant's protestations of good faith, of the discharge of salesmen who made misrepresentations,[6] and of cooperation with the postal authorities must be weighed against the evidence of the actual operations in which defendant engaged. He dealt in deceitful statements of half truths and concealed material facts.[7] His actions were not those of a legitimate business man engaged in the permissible "puffing" of his product. The ultimate issue is that of intent and it was resolved against the defendant by the district court which found that he acted with intent to defraud and that the scheme was "reasonably calculated to deceive persons of ordinary prudence and comprehension."[8] The record, viewed as a whole, sustains the decision of the district court.

Affirmed.

---

6. These misrepresentations included statements as to paved roads and the existence of supermarkets on the properties.

7. This is enough to establish a scheme within the prohibition of the mail fraud statute. Williams v. United States, 10 Cir.,

368 F.2d 972, 975, cert. denied 386 U.S. 997, 87 S.Ct. 1317, 18 L.Ed.2d 345.

8. Gusow v. United States, 10 Cir., 347 F.2d 755, 756, cert. denied 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159.