RASMUSSEN DRILLING, INC., a Colorado Corporation licensed to do business in Wyoming, Plaintiff-Appellant,

v.

KERR–McGEE NUCLEAR CORPORATION and Kerr-McGee Corporation, Defendants-Appellees.

No. 76–1729.

United States Court of Appeals, Tenth Circuit.

Submitted Nov. 18, 1977.

Decided Jan. 18, 1978.

Rehearing Denied Feb. 13, 1978.

James R. Prochnow, Denver, Colo. (Thomas J. Constantine, Denver, Colo., on the brief), of Hindry & Meyer, Denver, Colo., for plaintiff-appellant.

Peter H. Holme, Jr., Denver, Colo. (Edmond F. Noel, Jr., Denver, Colo., on the brief), of Holme, Roberts & Owen, Denver, Colo., William T. Schwartz, Casper, Wyo., Derrill Cody and Clydine Cornett, Oklahoma City, Okl., for defendants-appellees.

Before SETH, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Rasmussen Drilling, Incorporated (Rasmussen), a Colorado corporation, plaintiff below, appeals form a jury verdict and judgment dismissing its complaint and cause of action against Kerr-McGee Nuclear Corporation and Kerr-McGee Corporation (Kerr-McGee), defendants below, seeking a quiet title decree and order of ejectment involving certain lode mining claims situate in Section 17, Township 35 North, Range 74 West of the 6th P.M., Converse County, Wyoming.

Following considerable pleading and pre-trial discovery, an eight-day trial to a jury was concluded on June 2, 1976. The record is voluminous. The critical issue presented for decision was: Which of the parties had prior possessory rights by reason of substantial compliance with the federal and Wyoming mining laws requisite for the establishment of valid lode mining claims in Section 17? The parties entered into a written stipulation that the respective claims were proved to be valuable following discovery of uranium ore. Thus, the bulk of the evidence dealt with the statutory requirements involving staking, location monuments, validation, core drilling, filings, and matters of both actual and constructive notice.

Some of the general rules governing appellate review of a jury verdict following trial of a diversity based civil case may be helpful guidelines leading to our disposition of the challenges raised. A party seeking reversal must establish that alleged trial court errors were prejudicial and clearly erroneous, rather than harmless. Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A. It is not the function of the appellate court to infer material facts or to make controlling inferences which the trial court [or jury] has not inferred or made and which, if done, would, in effect, constitute trial de novo. *Transport Equipment Co. v. Guaranty State Bank*, 518 F.2d 377 (10th Cir. 1975). A choice between two permissible views of the evidence is not "clearly erroneous." *United States v. Yellow Cab Company*, 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949); *Kiner v. Northcutt*, 424 F.2d 222 (10th Cir. 1970). Where an issue is not clear of doubt, the views of a federal district judge [in a diversity case] who is a resident of the state where the controversy arose interpretive of that state's laws, carry extraordinary force on appeal where there are no state decisions directly on point or none which provide a clear precedent. *United States v. Hunt*,

513 F.2d 129 (10th Cir. 1975). Upon review, the appellate court does not retry the facts, and a trial court finding based on sharply conflicting evidence is binding. *Buena Vista Homes, Inc. v. United States*, 281 F.2d 476 (10th Cir. 1960). Jurors are charged with the exclusive duty of assessing the credibility of witnesses and determining the weight to be given testimony, taking into consideration the appearance and general demeanor of each and every witness. *United States v. Downen*, 496 F.2d 314 (10th Cir. 1974), *cert. denied*, 419 U.S. 897, 95 S.Ct. 177, 42 L.Ed.2d 142 (1974). Trial court findings on sharply conflicting evidence are conclusively binding on appeal. *Golubin v. United States*, 393 F.2d 590 (10th Cir. 1968), *cert. denied*, 393 U.S. 831, 89 S.Ct. 100, 21 L.Ed.2d 102 (1968); *United States v. 79.95 Acres of Land, More or Less, in Rogers County, State of Oklahoma*, 459 F.2d 185 (10th Cir. 1972); *Davis v. Cities Service Oil Company*, 420 F.2d 1278 (10th Cir. 1970). Our review in relation to evidence, is limited to the inquiry whether the record contains substantial evidence to support a conclusion. *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Appellate courts do not impute to a jury the inability to understand correctly the totality of the trial court's instructions, even in a complicated case, nor will courts impute nonfeasance, in the form of disregard of the trial court's instructions, to a jury. *United States v. Smaldone*, 485 F.2d 1333 (10th Cir. 1973); *Ellis v. State of Oklahoma*, 430 F.2d 1352 (10th Cir. 1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546 (1971). The jury—or the court if the case is tried without a jury—has the *exclusive* function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact. *Loew's Inc. v. Cinema Amusements*, 210 F.2d 86 (10th Cir. 1954), *cert. denied*, 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115 (1954). The reviewing court must view the evidence in the light most favorable to the prevailing party. *Joyce v. Davis*, 539 F.2d 1262 (10th Cir. 1976); *Hart v. Western Inv. & Development Co.*, 417 F.2d 1296 (10th Cir. 1969). No error in either the admission or the exclusion of evidence and no error in any ruling or order or in anything done or omitted by the trial court or by the parties is ground for granting a new trial or for setting aside a verdict unless the error or defect affects the substantial rights of the parties. Fed.Rules Civ.Proc. rule 61, 28 U.S.C.A.; *Harris v. Quinones*, 507 F.2d 533 (10th Cir. 1974); *Herron v. Rozelle*, 480 F.2d 282 (10th Cir. 1973). The trial court's conduct of trial proceedings, including rulings on motions and objections, will not be disturbed on appeal unless it affirmatively appears from the record that the trial court abused its discretion. *White Motor Corporation v. Stewart*, 465 F.2d 1085 (10th Cir. 1972), *cert. denied*, 409 U.S. 1061, 93 S.Ct. 561, 34 L.Ed.2d 513 (1972).

We turn now to a summary review of the evidence in the record before us, considered in the light most favorable to Kerr-McGee, the prevailing party.

Kerr-McGee had engaged in uranium exploration in the South Powder River Basin of Wyoming for several years prior to 1967. That year it commenced uranium ore exploration work on Section 17, Township 35 North, Range 74 West of the 6th P.M., Converse County, Wyoming. The results of the exploratory work were such that Kerr-McGee decided to stake lode mining claims in Section 17. Kerr-McGee proceeded first to contact the surface estate owners, William J. Smith and Florence Coates, respectively, relative to surface use and damage agreements in contemplation of mining activities. Written surface agreements were soon entered into between the parties. Kerr-McGee then hired Worthington, Lenhart & Associates, Inc., to coordinate and supervise the necessary surveying, staking and validation drilling of lode mining claims in Section 17. When completed they became known as the Yike claims. William G. Ladd of the Lenhart firm, a graduate civil engineer and licensed land surveyor, testified that he personally supervised the location work on the Yike claims commenc-

ing October 30, 1967. Validation holes were drilled on the respective claims in November, 1967, by William Kampf, an employee of a drilling company. Staking of the claims was substantially accomplished before December, 1967, but, because of harsh weather, some side-center stakes were not in place until May of 1968. The Kerr-McGee discovery, staking and location work was thus accomplished before Rasmussen undertook any staking or other location work. Kerr-McGee's location certificates for its various Yike lode claims covering all of Section 17 were completed and filed in the name of its agent, William G. Ladd; in the office of the County Clerk of Converse County, Wyoming, on December 27, 1967. *By inadvertence and oversight a clerical error was made in the description of the claims in that the location certificates described the section as 19 rather than 17.* These mistakes were not discovered until sometime early in August, 1968, when Robert Marvin, of Kerr-McGee, noted them while reading a monthly land check magazine known as "Dever Report." On August 8, 1968, Kerr-McGee caused amended lode mining certificates correcting the section description to be filed of record covering each of its Yike lode claims staked in Section 17. In February, 1968, Kerr-McGee undertook radiometric probing of its Yike claims validation holes, conducted by Bruce Johnston of Century Geophysical Corporation. Kerr-McGee performed the requisite annual assessment work on its Yike claims in conjunction with a wide-ranging mineral discovery-exploration program throughout the South Powder River area. Kerr-McGee presented trial testimony of the following witnesses relating to its discovery, surface agreement and location work, staking and drilling of validation holes on its Yike claims, all accomplished prior to July, 1968: William G. Ladd, A. L. Worthington, Edward R. Brandt, William J. Smith, William David Reese, Jr., William Kampf, Bruce N. Johnston, William O. Fields, Jay W. Smith, John G. Jebsen, and Florence Coates.

Rasmussen commenced its location work on claims in Section 17 in July and August of 1968 under the direction of Fred Carr.

Ed Engleman, a landman, conducted an examination of the records in the office of the County Clerk of Converse County, Wyoming, at Carr's request. He did not find any lode mining certificates filed in Section 17; however, he did find that Section 19 contained a double filing. Rasmussen's Joy lode mining claims were staked and the certificates were filed in the County Clerk's office on July 17, 1968. The principal witness for Rasmussen was Lowell Rasmussen. He and his son testified that they were on Section 17 in June and July of 1968 and that neither saw any location stakes. Similar testimony was presented on behalf of Rasmussen by Blake Fox, a consulting geologist, Wallace Pierson, a geologist, and Don Link, vice-president and general manager of Morrison Nuclear, the company which supplied Rasmussen with financing and expertise. Lowell Rasmussen testified that he first became aware of Kerr-McGee's adverse mining claims in Section 17 in the fall of 1968, and that when he attempted to assume possession of the Joy claims, he was forcefully restrained from entering upon the property by Kerr-McGee's personnel.

The parties stipulated to the discovery of valuable uranium ore mineral in Section 17. Kerr-McGee's discovery occurred about October 31, 1967.

We believe that testimony which may have been particularly persuasive to the jury corroborative of Kerr-McGee's contentions is that given by William J. Smith, Florence Coates and Attorney William Hodge Brown.

William J. Smith, a witness called by Kerr-McGee, testified that: He owned the surface estate covering the north half of Section 17 together with other lands in the area; that he conducted a livestock grazing operation under the corporate names of Smith Sheep Company and Smith Land Company, of which he was president and principal stockholder at the time of trial; that about February 26, 1968, he, both as president of the corporations and individually [joined by his spouse], executed an instrument admitted in evidence as Defendants' Exhibit HH entitled "Agreement with

Surface Owner" with Kerr-McGee authorizing Kerr-McGee to enter in and upon the surface estate of the north half of Section 17 to conduct exploration, mining and milling operations for all minerals other than oil and gas in consideration of a 2½% royalty. and certain per acre, per annum payments as surface damages; that an addendum attached to the agreement described various Yike claims which had been staked and "validated" during the fall of 1967 before the agreement was executed; that he (Smith) personally observed Kerr-McGee crews "validating" the Yike claims; that Lowell Rasmussen phoned him in the fall of 1968 and inquired why "we were keeping him off [of the north half of Section 17], that he had validated, that he had staked those claims" and that he told Rasmussen that he had already made a "deal" with Kerr-McGee "who had taken it over and he [Rasmussen] had no right to go in there. I had given them [Kerr-McGee] [the] right, and they had staked the land." [R. Vol. X, pp. 909–922.]

Florence Coates, of Glenrock, Wyoming, a witness called by Kerr-McGee testified: That in 1967 she worked on the ranchplace of Burton Barber which was situated along the Platte River between Glenrock and the "power plant" of Pacific Power and Light Company; that the Barber ranch property was extensive and included lands in Section 17; that she was with Barber [who was deceased at the time of trial] when he entered into a Mining Lease, admitted in evidence as Defendants' Exhibit GG, with Kerr-McGee which included the SW ¼ and the S ½ SE ¼ of Section 17 [right of surface use] in consideration of a covenant for payment of a royalty to Barber from the production and sale of ore; that she was with Barber after the Mining Lease was executed and observed Kerr-McGee personnel, or those employed by Kerr-McGee, survey, stake and drill; that she was with Barber sometime later at Barber's ranch house in Glenrock when Lowell Rasmussen made "numerous contacts" and Barber informed Rasmussen of his agreement [Lease] with Kerr-McGee and that only Kerr-McGee was entitled to be on Barber's

Section 17 lands; that she personally observed Lowell Rasmussen "checking" Kerr-McGee holes and stakes on Barber's Section 17 lands; that Rasmussen "lied" to her and Barber "repeatedly" in that while he stated that he had drilled on the Section 17 lands he would thereafter deny that he had done so in order to avoid payment of surface damages to Barber. [R., Vol. XI, pp. 1241–1260.]

Attorney William Hodge Brown of Casper, Wyoming, a witness called by Kerr-McGee testified: That in 1969 he was contacted by Bob Fowler and his attorney by phone who called him on behalf of Dakota Minerals Company, of South Dakota; that Brown was requested to look into and render an opinion on the validity of the title to certain lode mining claims Rasmussen was then negotiating to sell to Dakota Minerals Company, located in Sections 6 and 17, Township 35 North, Range 74 West of the 6th P.M., Converse County, Wyoming; that in June or early July of 1969, Ed DeJulius, Bob Fowler and Lowell Rasmussen were in his law office in Casper for a conference after Brown had been informed by Fowler of Dakota Minerals that there were some conflicting claims involved and that before consummating the purchase from Rasmussen, Dakota Minerals wished to be assured of good title; that during the meeting, Brown kept notes which were admitted in evidence as Defendants' Exhibit II; that Rasmussen stated that the first information he obtained relative to the existence of probable commercial quantities of uranium in the area of Section 17 was indicated by an airborne type scintillometer; that following the airborne readings, Rasmussen examined the area, including Section 17; that Rasmussen remarked that, upon such actual examination, he found one post with a location certificate on it reputedly locating a lode claim, signed by a person named Ladd; that Rasmussen had Ed Engleman check the County Clerk's records in Converse County relative to any filings of any location certificates in Section 17 and was thereafter informed that none existed; that when Brown requested that Rasmussen de-

scribe what he saw on the ground [in Section 17] he [Brown] diagrammed that which Rasmussen described; that Rasmussen described what he [Rasmussen] regarded to be two lode mining claims, end to end, located in the southeast quarter of Section 17; that Rasmussen also referred to two similar lode mining claims located in the northeast quarter of Section 17; that Rasmussen described two posts at or near the common ends of the two "sets" of claims; that Rasmussen, after observing the location notice and posts, concluded that the locations were, per notice, made the previous fall and that because the location notices were dated more than 90 days prior to the check he caused to be made of the County Clerk's records relative to Section 17 lode mining certificate recordations that any prior staking and posting of notices would, in Rasmussen's opinion, be totally defective, indicating abandonment under the Wyoming statutes; that Brown was told during this conference that Kerr-McGee had succeeded to the Ladd claim or claims and was either asserting or threatening to assert a title superior to that of Rasmussen; that Brown recalled some remark having been made that a representative of Kerr-McGee had said that armed guards would be placed on Section 17 to run anybody off who might attempt to take possession; that the conference lasted from mid-morning until mid-afternoon; that Bob Fowler of Dakota Minerals authorized Brown to testify relative to the aforesaid conversations, expressly waiving any privilege on behalf of Dakota Minerals, by whom Brown had been employed. [R., Vol. IX, pp. 769, 795.]

On appeal, Rasmussen contends that the trial court erred in failing to grant its Motion for Mistrial and in giving erroneous instructions. Specific errors are charged, in the following manner, precisely as posed by Rasmussen:

1. Did the trial court's remarks, in the presence of the jury, on the first day of trial, that he, the Court, had been misled by certain statements of Rasmussen's chief witness, prejudice Rasmussen to the extent that its motion for a mistrial should have been granted?

2. Did the Stipulation entered into by Rasmussen and Kerr-McGee during trial as to the matter of "discovery" of mineral eliminate the requirement for Kerr-McGee to prove facts as to how it "discovered" mineral relative to Section 17?

3. Did the trial court commit reversible error in instructing the jury that statutory "discovery" work and the filing of location certificates under Wyoming law "need not be performed in the precise order set forth or within any particular time so long as they are performed before some other locator claims the ground"?

4. Did the trial court commit reversible error by instructing the jury that "knowledge of a prior location places a duty upon the second locator to make inquiry to determine the extent of the adverse party's work performed in relation to exploration and development" without explaining to the jury that the second locator's duties, as defined by that instruction, relate only to the necessity of conducting a physical inspection of the land at issue?

5. Did the trial court commit reversible error in instructing the jury that Rasmussen had the burden of proving both that the challenged claims of Kerr-McGee were not existent, invalid or had been abandoned, and, in addition, that the land underlying those claims was open to location?

6. Did the trial court commit reversible error in instructing the jury that "there is no requirement in the law that boundaries and notices on the claims be maintained or replaced in order for the locator to keep his location good" in light of the fact that Kerr-McGee has based the validity of its claims on amended location certificates which adopt the boundaries as originally marked?

7. Did the trial court commit reversible error in instructing the jury that "constructive notice means notice given by what is in county records" without further instruction that such notice only exists if the document at issue is filed as a part of those county records where one has reasonable obligation to search?

### I.

Rasmussen contends that the trial court's comments concerning litigant Lowell Rasmussen's testimony in the presence of the jury in mid-afternoon on the first day of trial, constitute reversible error when due consideration is given to the nature of those comments and the setting in which they occurred. We disagree.

On direct examination, Lowell Rasmussen had testified to certain photographs depicting a particular cattle shed and the general area of a portion of Section 17, which had been admitted in evidence. On cross-examination, Rasmussen was asked how far away from the nearest highest point in the photograph admitted as Plaintiff's Exhibit 3 he was standing "when you took the picture?" Rasmussen responded "I'm not sure I took that photograph. Did I say I took that photograph." [R., Vol. VI, p. 114.] Rasmussen then stated that he believed the photographs, renumbered as Plaintiff's Exhibits 38 and 38A, were taken by Ed DeJulius and that he [Rasmussen] was not present when they were taken. [R., Vol. VI, pp. 115, 116.] Previously, during voir dire by counsel for Kerr-McGee, Rasmussen was asked where he was standing in Section 17 when the photographs were taken. He responded "I was approximately a hundred feet from the south boundary of the section." [R., Vol. VI, p. 54.] Again, when asked "how far away this nearer highest point is from where you were standing *when you took the picture?*", Rasmussen responded "It appears to me that that is a quarter of a mile, I would guess." (Emphasis supplied.) [R., Vol. VI, p. 56.] Then, when asked "do you remember seeing the stakes at the time you took the picture?", Rasmussen replied "No, no. It was an after thought." [R., Vol. VI, p. 57.] The trial court had previously admitted Exhibits 38 and 38A in evidence, without objection, based upon Rasmussen's testimony that he had taken the photographs.

After the photographs were received in evidence, it was developed on cross-examination that Rasmussen did not recall having stated that he took the photographs but that, to his best recollection, they were taken by Ed DeJulius who later described the direction from which he took the photographs to Rasmussen. Rasmussen was not present when they were taken. [R., Vol. VI, pp. 115, 116.] Thereupon, this colloquy took place in the presence of the jury:

MR. HOLME: I have to renew my objection then, Your Honor, on the ground of inadequate foundation.

THE COURT: Yes. Your objection is sustained and these items are stricken from evidence and the jury is instructed to disregard them.

(Plaintiff's Exhibits 38 and 38A stricken from evidence.)

MR. HOLME: Thank you, sir.

MR. CONSTANTINE: Your Honor, I think the witness has previously testified that these things accurately portray the cattle shed and he has seen it on many trips out there.

THE COURT: Mr. Constantine, my notes indicate the witness said that these were taken in 1971 looking north, taken a hundred feet from the south boundary of Section 17. He testified to the horizontal dimensions of them and I assumed from that that he was there and supervised the taking of them or had been there.

*Now, the fact that he wasn't there at the time they were taken I think has been misleading and it is on that basis for lack of foundation that they are not stricken.* (Emphasis supplied.) [R., Vol. VI, p. 116.]

Further colloquy then took place, during which counsel asked certain questions of Rasmussen, leading to these remarks:

MR. CONSTANTINE: Your Honor, the part I object to is that our questions misled the Court, and those were not our questions, those were Mr. Holme's questions.

THE COURT: I wasn't confining it to any one set of counsel, but I was certainly misled as to what was in fact the situation, that this witness wasn't there and didn't see them taken.

MR. HOLME: I think it is the answers that are misleading, not the questions.

**1154**

THE COURT: Yes, that's exactly right.

[R., Vol. VI, p. 117.]

 Rasmussen moved for mistrial on the ground that the trial court's characterization, in the presence of the jury, of Rasmussen's testimony relative to the taking of the photographs as being "misleading" was prejudicial and inflammatory in that it had the effect of "disparaging" Rasmussen in the eyes of the jurors. The contention is without merit. Counsel for Rasmussen did acknowledge to the trial court that he did not challenge the court's ruling on the inadmissibility of the photographs because of lack of proper foundation. [R., Vol. VI, p. 158.] The trial court denied the Motion for Mistrial, and, in doing so, stated that his remarks, if disparaging, went to the specific testimony only (foundation relative to the photographs) and not the (character) of the witness himself; that if any discredit occurred, it was the result of Rasmussen's contradictory testimony. [R., Vol. VI, p. 192.] The trial court volunteered to give the jury a special instruction that the court's remarks were not intended to disparage Rasmussen. This offer was rejected! [R., Vol. VII, p. 192.]

 Rasmussen contends that while he is not unmindful that the trial court instructed the jury that neither the remarks of the court nor of counsel are evidence and that any remarks made by the court during trial [other than those on rulings] should not be considered by the jurors in arriving at their verdict, that, even so these instructions were, in effect, nullified by the court's instruction that "a witness may be discredited or impeached by contradictory evidence or by evidence that at some other time the witness has said or done something or failed to say or do something which is inconsistent with that witness' present testimony." [Brief of Appellant, pp. 12, 13.] Rasmussen concludes that "In summary, because of this outburst of the trial court, in the presence of the jury, on the first day of trial, the failure to grant Appellant Rasmussen's Motion for a Mistrial is reversible error." [Brief of Appellant, p. 13.]

Rasmussen's contentions are without merit. They border on the frivolous.

 The trial court has the power to direct the trial along recognized lines of procedure in a manner reasonably thought to bring about a just result and in pursuit of that goal nonprejudicial comments may be made by the trial court from time to time. *Lowther v. United States*, 455 F.2d 657 (10th Cir. 1972), *cert. denied*, 409 U.S. 857, 93 S.Ct. 139, 34 L.Ed.2d 102 (1972); *Inland Freight Lines v. United States*, 191 F.2d 313 (10th Cir. 1951). It is perfectly obvious that the remarks of the trial court in the instant case relative to having been misled could only have related to the fact that the trial judge had admitted the photographs in evidence based on Rasmussen's testimony that he took them. The use of the word "misleading" was thus entirely proper and correct in the context of the problem presented. We do not believe that a person of average intelligence or common sense could have interpreted the trial court's remarks as an assault upon the honesty, integrity or credibility of Rasmussen.

 A trial court is vested with wide discretion to state the facts and to comment on the evidence in charging the jury. *Starr v. United States*, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841 (1894); *Lowther v. United States, supra.* A trial judge is allowed to participate in a trial and ask questions, including leading questions, of a witness in order to ascertain the facts in the search for the truth. *United States v. Wheeler*, 444 F.2d 385 (10th Cir. 1971). A federal trial judge may comment reasonably upon evidence, and express his opinion of it, provided it is made clear to the jury that it is not bound by his views. *United States v. Sowards*, 339 F.2d 401 (10th Cir. 1964). The trial judge cannot show hostility toward or become an advocate for one side. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *McBride v. United States*, 409 F.2d 1046 (10th Cir. 1969), *cert. denied*, 396 U.S. 938, 90 S.Ct. 282, 24 L.Ed.2d 240 (1969). A judge presiding over a trial is not a mere umpire. *Jordan v. United States*,

295 F.2d 355 (10th Cir. 1961), cert. denied, 368 U.S. 975, 82 S.Ct. 479, 7 L.Ed.2d 438 (1962). And an appellant may not complain on appeal of errors which he himself has induced or invited. Sanders v. Buchanan, 407 F.2d 161 (10th Cir. 1969).

It is presumed that jurors will be true to their oath and will conscientiously observe the instructions and admonitions of the Court. United States v. Pennett, 496 F.2d 293 (10th Cir. 1974); Ellis v. State of Oklahoma, 430 F.2d 1352 (10th Cir. 1970); cert. denied, 401 U.S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546 (1971); Baker v. Hudspeth, 129 F.2d 779 (10th Cir. 1942), cert. denied, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942). The admissibility of evidence is discretionary with the trial court and will not be disturbed on appeal unless clearly erroneous. Pipeliners Local Union No. 798, Tulsa, Okl. v. Ellerd, 503 F.2d 1193 (10th Cir. 1974); United States v. Acree, 466 F.2d 1114 (10th Cir. 1972), cert. denied, 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973).

## II.

Rasmussen contends that the trial court erred in ruling that because of a written stipulation between the parties, filed during the first day of trial, that neither party was required to prove the discovery of valuable uranium ore. The stipulation is:

The parties hereby stipulate and agree that proof at trial in this matter of the discovery of valuable uranium ore as required by Wyoming or Federal Law will not be necessary. Each party may offer proof that various acts and events have occurred which if the jury finds were done or have occurred constitute a mineral discovery on Section 17. However, each party shall still be required to prove substantial compliance with other location requirements of the applicable Wyoming and Federal Laws.

[R., Vol. I, p. 111.]

A dispute between the parties relative to the meaning of this stipulation surfaced on the third day of trial. Rasmussen contends that the stipulation did not eliminate the necessity of Kerr-McGee to prove when and how it discovered valuable uranium mineral on Section 17, i. e., proof of physical acts in compliance with the other applicable location requirements under Wyoming and federal laws.

We hold that Rasmussen's contention is contrary to the clear and unambiguous language of the stipulation. The statement that proof of discovery is not necessary is absolute and unequivocal. However, the subsequent sentence in the stipulation is just as clear: that even though such proof is not required, nevertheless the parties may, if they wish, present such proof. The final sentence of the stipulation distinctly excepted from the waiver proof of all evidence by the parties relating to the important acts required by the law governing perfecting lode locations. This latter statement was, we believe, confirmed by counsel for Rasmussen during a May 28, 1976, in-chamber conference. [R., Vol. X, p. 958.] In addition, the record discloses that various witnesses for Kerr-McGee did in fact testify to many physical acts relating to discovery of valuable uranium ore on Section 17. The trial court submitted this instruction to the jury which, in our view, was clear and proper on the discovery issue:

The Court instructs the jury that there is no dispute in this case that the lands involved are underlain by valuable minerals, in this case uranium, and that whether a discovery of a valuable, locatable mineral was made is not an issue in this case. The question in this case is which party first substantially complied with the other requirements of the Wyoming and Federal Statutes. Each of the parties is claiming possession of the same property and the controversy between the claimants is as to which is entitled to priority.

[R., Vol. V, p. 8.]

The trial court correctly instructed the jury that following discovery of valuable mineral deposits, the discoverer is accorded 60 days within which to perform requisite physical tasks prescribed by law but that the statutory location work re-

quired need not be performed in a particular order or within a particular time provided that all of the required acts are performed before a second locator claims the grounds.

 The trial court's ruling was not erroneous. Certainly, it was not "clearly erroneous" under Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.; *Volis v. Puritan Life Ins. Co.*, 548 F.2d 895 (10th Cir. 1977).

### III.

Rasmussen argues that the trial court committed reversible error in instructing the jury that the statutory discovery work and the filing of location certificates under Wyoming law need not be performed in the precise order set forth or within any particular time so long as they are performed before some other locator claims the ground. We have heretofore disposed of this contention contrary to Rasmussen's views, but we will develop our basis more fully.

The instruction given objected to by Rasmussen is:

You are further instructed that these tasks need not be performed in the precise order set forth or within any particular time so long as they are performed before some other locator claims the ground.

[R., Vol. V, p. 9.]

 Discovery of a valuable mineral (as stipulated to in this case) is a primary prerequisite to a valid location. Discovery is not established, of course, by proof of staking, marking and recording of a location certificate. It has long been held that the prime requisites for establishment of valid possessory title to a lode and/or placer mining claim are the discovery of a valuable mineral, the distinct marking on the ground of the boundaries, the actual taking of possession of the claim and the performance of the requisite amount of development work. *Donnelly v. United States*, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913); *Erhardt v. Boaro*, 113 U.S. 527, 5 S.Ct. 560, 28 L.Ed. 1113 (1885); *Slothower v. Hunter*, 15 Wyo. 189, 88 P. 36 (1906).

 The parties agree that the decisions are replete holding that failure to record a location certificate within the period prescribed by statute, i. e., 60 days from the date of discovery as set forth in Wyo. Stat.1957 § 30–1, does not render the certificate invalid or void. *Columbia Copper Mining Co. v. Duchess Mining, Mill & S. Co.*, 13 Wyo. 244, 79 P. 385 (1905); *Slothower v. Hunter, supra.* Even so, Rasmussen contends that the position he presses is not without support, relying on *Kendall v. San Juan Mining Co.*, 144 U.S. 658, 12 S.Ct. 779, 36 L.Ed. 583 (1892). That reliance is misplaced. In *Kendall*, the defendant was an intervening locator who had filed location certificates of record *before* the plaintiff locator had done so *after* the land upon which the plaintiff had previously staked and filed was withdrawn from the restrictions previously applicable by virtue of an Indian treaty. The plaintiff had entered the ground, discovered valuable ore, perfected the location of the lode claim and filed. All of this was done by the plaintiff locator during the period that the lands were *not open to such location because they were restricted.* After the reservation of the premises by reason of the Indian treaty was *extinguished*, the lands became "open" to discovery and location for the first time. The Court held that under these circumstances the plaintiff was bound to record the certificate of location within three months (90 days) following *extinguishment of the reservation* in order to preserve prior right. The lands in Section 17 involved in the instant case were *at all times open* for location and filing by the world at large. Thus, *Kendall v. San Juan, supra*, simply does not apply. Rasmussen's reliance on *Kendall* is further misplaced in that Rasmussen *was not* an intervening locator because it had *actual notice* of Kerr-McGee's claims. This is and has been, of course, vigorously denied by Rasmussen. We hold, however, that there is substantial evidence in the record to support the jury verdict on the basis of Rasmussen's *actual notice* of the Kerr-McGee claims in place on the

ground, together with *constructive notice* of the original filings of the Yike certificates, even though they were recorded in Section 19 rather than Section 17.

Engleman, a landman representing Rasmussen's interest in the area, while finding no filings in Section 17, *did, however, discover two "sets" of filings in Section 19.* Engleman did not inspect the Section 17 land where the Kerr-McGee location certificates on discovery stakes properly described the Yike claims as being in Section 17. Engleman testified, as more fully discussed hereafter, that one making a "detailed" title check would "trace" such claims on a metes and bounds description basis. If this had been done, it would have become clear that the Yike claims did not "fit" in Section 19. There may be additional merit to Kerr-McGee's argument that Rasmussen had constructive notice of the Yike claims. Rasmussen filed his lode location certificates in July of 1968, properly describing the claims as being located in Section 17. Kerr-McGee had, of course, filed its original location certificates in December of 1967. These certificates, by mistake, described the Yike claims as being in Section 19 rather than Section 17. Kerr-McGee discovered this mistake and filed amended certificates of record in August of 1968 pursuant to the provisions of Wyo.Stat.1957, § 30-4, which provide:

> Whenever it shall be apprehended by the locator, or his assigns, or any mining claims or property heretofore or hereafter located, that his or their original location certificate was defective, erroneous, or that the requirements of the law had not been complied with before the filing thereof, or shall be desirous of changing the surface boundaries of his or their original claim or location, or of taking in any part of an overlapping claim or location which has been abandoned, such locator or locators, or his or their assigns, may file an additional location certificate in compliance with and subject to the provisions of this act [§§ 30-1 to 30-26]; provided, however, that such relocation shall not infringe upon the rights of others existing at the time of such reloca-

tion, and that no such relocation, or other record thereof, shall preclude the claimant or claimants from proving any such title or titles as he or they may have held under any previous location.

Kerr-McGee contends that its rights, by reason of the filing of the amended lode certificates, *relate back* to the date of its original locations by virtue of *Hagerman v. Thompson*, 68 Wyo. 515, 235 P.2d 750 (1951). There the court stated that the purpose of posting notice of location of mining claims and marking boundaries as required by statute, is designed to inform others who may wish to locate claims on the same lands of the prior actions, and that those with such knowledge cannot prevail in a quiet title action predicated upon the first locator's failure to properly describe quarter sections and failure to affix a special name to a claim in the location certificate. Such were considered to be mere defects, cured by filing of an amended location certificate coupled with the subsequent locators' actual knowledge of the claim. The Court held that the original and amended certificates of location are to be construed together, and if found to be sufficient, relate back to the date of original location. The court observed that where a mining locator attempts, in good faith, to comply with the law, courts are inclined to be liberal in construing his acts so as not to defeat his claim by technical criticism. The Court favorably referred to its prior decisions in *Scoggin v. Miller*, 64 Wyo. 206, 189 P.2d 677 (1948); *Miller v. Scoggin*, 64 Wyo. 248, 189 P.2d 693 (1948); *Chittim v. Belle Fourche Bentonite Products Co.*, 60 Wyo. 235, 149 P.2d 142 (1944); and *Griffith v. Noonan*, 58 Wyo. 395, 133 P.2d 375 (1943), for the general rule that a miner who proceeds in good faith to comply with the various requirements applicable to perfection of a valid location is to be treated with indulgence, and the notices required are to receive a liberal construction.

 While the amendment of a location certificate will relate back to the original certificate so as to perfect the location,

it is a preventative measure in legal effect in that it cannot cut off valid rights which may have been acquired by a subsequent locator. Even so, it is even more fundamental that a careful, thorough inspection of the ground is required in order to ascertain whether any of the following statutory steps have been previously undertaken thereon to establish a valid lode claim: (1) setting of a discovery monument or stake and the posting of a notice thereon containing this information: (a) the name of the lode claim, (b) the name of the discoverer or locator, and (c) the date of discovery; (2) marking of the boundaries of the claim with six substantial monuments of stones or posts sunk in the ground, one at each corner and one at the center of each side line, (3) sinking of a shaft upon the discovery lode or fissure or drilling of a hole or holes aggregating 50 feet in depth, or digging an open cut or tunnel.

 In *Globe Mining Co. v. Anderson,* 78 Wyo. 17, 318 P.2d 373 (1957), the court specifically held that the function of recording the location notice in the office of the county clerk is that of giving constructive notice and that one who has actual notice will not be heard to complain, even if no recordings have been made in the county records. The *Globe* decision definitively spelled out the *Scoggin v. Miller, supra,* and *Hagerman v. Thompson, supra,* rule that one who has actual notice may not rely upon or take advantage of defects in recordation. *See also: Yosemite Mining Co. v. Emerson,* 208 U.S. 25, 28 S.Ct. 196, 52 L.Ed. 374 (1908); *Western Standard Uranium v. Thurston,* 355 P.2d 377 (Wyo.1960); *Columbia Standard Corporation v. Ranchers Exploration and Development, Inc.,* 468 F.2d 547 (10th Cir. 1972), *cert. denied,* 410 U.S. 991, 93 S.Ct. 1506, 36 L.Ed.2d 190 (1973). In *Columbia Standard, supra,* we observed that a locator must make a "good faith" entry and that although a prior locator's location notices of record were defective still the subsequent locator who discovered the defects was in bad faith because actual notice of the prior locator's claims was attributed by reason of the work done and performed on the ground to validate the

claims which, if examined, would have constituted notice in fact. The cumulative information obtained by Rasmussen and/or his agents or associates relative to Kerr-McGee's prior mining activity on Section 17 and adjacent properties was such as to constitute actual notice by Rasmussen of Kerr-McGee's location of the Yike lode mining claims in Section 17. In actions to recover possession of land one must prevail on the strength of his own title (right) and not on the weakness of his adversary's title (right). *Columbia Standard, supra; Kanab Uranium Corporation v. Consolidated Uranium Mines,* 227 F.2d 434 (10th Cir. 1955).

 The evidence was substantial in relation to the physical acts performed by Kerr-McGee in perfecting the Yike claims, including posting of the notices on each claim. Under the Wyoming statute, the posting of the notice on the ground gives sufficient notice to all subsequent prospectors of the prior locator's intent to occupy, hold and possess the ground claimed. *Hagerman v. Thompson, supra* ; Wyo.Stat. 1957 § 30–3(2).

 The "location certificates . . on record . . . [take] the place of the location notices, rendering proof of the posting of the notices unnecessary as against . . . adverse claimants." *Bergquist v. West-Virginia-Wyoming Copper Co.,* 18 Wyo. 234, 106 P. 673, at p. 685. The purpose to be thus served would seem to be predicated upon the possibility that the boundary markers, just as the posted notice, may very likely be lost or destroyed on the ground. Under such circumstances, constructive notice is provided by the location certificate to be recorded in accordance with Wyo.Stat.1957 §§ 30–1(4), (5) and (6); *Scoggin v. Miller,* 64 Wyo. 206, 189 P.2d 677, 685 (1948).

### IV.

 We find no merit in the additional issues raised by Rasmussen. We will comment on some of them briefly. The trial court did not impose a heavier burden of proof on Rasmussen than that required

by law relative to the existence of the Kerr-McGee claims. While there is conflict whether Ed Engleman, a trained, skilled landman, worked directly under Rasmussen's direction relative to record checking, there is no question that Rasmussen requested of Fred Carr that Engleman check the records of filings in Section 17. [R., Vol. VII, pp. 217, 218.] Engleman, on cross-examination, testified that he found no lode mining certificates filed of record in Section 17, but that he found *two sets* of lode mining certificates filed in Section 19 under the name of the same locator. [R., Vol. VII, pp. 266–269.] When asked, after noting the double filing, and finding no filings in Section 17, whether that would lead him to see if the metes and bounds descriptions contained in the certificates filed in Section 19 represented a mistake in the designation of the section, Engleman replied that he would check those descriptions if he were conducting a detailed check. [R., Vol. VII, p. 269.] Engleman testified that he did report the double filing in Section 19 to Fred Carr and that it is entirely possible that he related the same information to Lowell Rasmussen because he met with him thereafter on several occasions. [R., Vol. VII, p. 270.] We believe that this testimony was persuasive when the trial court gave the following instruction so strongly opposed by Rasmussen:

> The Court instructs the jury that where a junior locator has had knowledge of the existence of load [sic] mining claims, he cannot raise an imperfect recordation of the Certificate of Location as a defect of which he can take advantage. Where a mining locator attempts in good faith to comply with the law, his mining claims should not be invalidated by technical criticism. The function of a location certificate on the County records is to make a permanent record of the location of a mining claim and one with actual notice that the ground is claimed cannot assert any deficiencies in the recorded titles. Where there is actual notice, constructive notice is unnecessary. *Constructive notice means notice given by what is in the County records.* (Emphasis supplied.)

[R., Vol. V, p. 13.]

Rasmussen contends that the trial court committed reversible error by so instructing on "constructive notice" without regard to where the underlying documents are recorded. It is Rasmussen's position that the Court should have given its requested instruction which describes constructive notice by that in the county records in the place where one has a reasonable obligation or duty to look. The argument is persuasive on its face. However, under the circumstances of this record, particularly in light of Engleman's testimony relative to the double filings in Section 19 and his testimony that if a "detailed" check were undertaken such certificates would be carefully "traced" on a metes and bounds basis (leading to locations in Section 17), we hold that the trial court's brief reference to "constructive notice" was certainly not clearly erroneous. If the certificates of location had been checked by Engleman in "detail," he would have found that those claims related only to Section 17.

WE AFFIRM.