James C. HEIDEMAN and Margaret Heideman, Plaintiffs-Appellants-Cross-Respondents,

v.

AMERICAN FAMILY INSURANCE GROUP, Defendant-Respondent-Cross-Appellant.†

Court of Appeals

*No. 90-1912. Submitted on briefs March 26, 1991.—Decided June 19, 1991.*

(Also reported in 473 N.W.2d 14.)

†Petition to review denied.

847

848

On behalf of the plaintiffs-appellants-cross-respondents, the cause was submitted on the briefs of *James W. Hammes* of *Cramer, Multhauf & Hammes* of Waukesha.

On behalf of the defendant-respondent-cross-appellant, the cause was submitted on the briefs of *M. Christine Cowles* and *Barbara A. O'Brien* of *Borgelt, Powell, Peterson & Frauen, S.C.* of Milwaukee.

Before Nettesheim, P.J., Scott and Anderson, JJ.

SCOTT, J. A jury found that by extreme and outrageous conduct, American Family Insurance Group intentionally caused James Heideman, a former American Family agent, extreme and disabling emotional dis-

tress. It awarded Heideman $150,000 in compensatory damages and $500,000 in punitive damages. On motions after verdict, the trial court changed two of the special verdict answers and dismissed the complaint. The trial court also commented that if the jury's answers were sustained on appeal, a new trial should be held because the answers were against the great weight of the evidence. The trial court then gave an "advisory opinion" relating to the damages. Heideman appeals.

American Family cross-appeals, primarily asserting that the trial court lacked subject matter jurisdiction to decide the case because worker's compensation provides the exclusive remedy. In the alternative, American Family contends that Heideman did not suffer a disabling emotional response; that the trial court employed the wrong standard of review in adjusting the damages; and that punitive damages are unconstitutional.

We conclude first that the trial court had jurisdiction to hear the case. We also conclude that the trial court erred in changing the jury's answers. In addition, we are not persuaded by any of the arguments raised by American Family's cross-appeal. We therefore reverse the judgment and remand for a reinstatement of the jury verdict.

Heideman began working as an insurance agent for American Family in 1969. By 1982, Heideman was earning approximately $50,000 a year and had won numerous achievement awards and sales competitions. In June of 1986, American Family revoked his agency. The facts leading up to his dismissal are lengthy but necessary to relate.

In October 1982, Heideman suffered a heart attack. He was off work until January 1983, at which time he returned to work on a part-time basis. A month later, Michael Shannon, Heideman's district manager, issued

Heideman a written request seeking medical documentation of any limitations on Heideman's work activities. Heideman complied. The letter from his physician, Dr. Howard Evert, recommended that Heideman restrict his work to forty hours per week, to be "divided up in any way that you [Heideman] see fit," but with the added caution that "the added stress of night time and weekend work should be avoided if possible." Dr. Evert's letter also stated:

> As you well know chronic stress is as great a contributor to myocardial [heart muscle] disease as any of the other factors that I listed above [cigarette smoking and high blood pressure]. You certainly were a victim of chronic stress and could very well become a victim of this problem again if you allow your work habits to return to the previous state.

As requested, Heideman gave a copy of this letter to Shannon.

About that time, Shannon instituted a system of minimum production standards. The new standards required all agents under Shannon's supervision to produce twenty-seven applications and $600 worth of new life insurance premiums each month. Any agent consistently failing to meet these standards was subject to termination.

American Family releases a quarterly report called a "monthly life production standing" which ranks the production of all district agents. The first report released after Heideman's return to work following his heart attack was dated April 30, 1983. Heideman was ranked last. On Heideman's copy of the report, Shannon circled Heideman's production and penned the notation, "Jim, this just has to improve."

Heideman testified he was told on several occasions that he was subject to the new requirements despite the medical limitations recommended because of his health. He stated he repeatedly was told to either increase sales or to consider selling off part of his agency if he intended to work fewer hours. Heideman testified that American Family's main focus was life insurance. Because that product was sold most often to married couples, sales required speaking to both spouses, and thus usually necessitated evening house calls. He further testified that American Family rebuffed his request to allow him to simply service his existing agency and was told he must continue to bring in more contracts. Heideman also stated that if he sold off part of his agency, American Family would select which of his customers it would take back. He stated he understood that if he failed to meet these conditions, American Family would terminate his agency.

Heideman testified that, as a result of these work pressures, he became physically run-down and increasingly anxious and stressed. He experienced anxiety attacks manifested by hyperventilation and chest pain, and at least once was hospitalized as a result. Heideman's wife testified that her husband exhibited severe mood swings and withdrew from the family, retiring to his bedroom when he came home from work and remaining there until morning. By the end of 1983 he was addicted to Valium.

At the beginning of every year, each agent was required to fill out a statement listing his or her goals for the year. On the goal statement dated January 11, 1984, Heideman wrote: "Agency growth will depend on my health, which comes first with me. My '84 goals will also depend upon my health throughout the year." Heideman testified that he was told on January 20, 1984 that he

854

must convert his existing life insurance policies "before someone else did." "Converting" means to change existing policies to new, generally more expensive, products. Heideman testified he understood this to mean that if he did not convert his policies, they would be taken from him and reassigned to other agents.

Heideman testified that although his physical health rapidly deteriorated toward the end of 1984, from a business standpoint 1984 was a very successful year because he "sold an awful lot of life insurance." Because of his declining health, however, he then began heeding Dr. Evert's advice to cut back on the number of evening hours worked, even though night calls are imperative to sell life insurance.

At the January 1985 meeting to plan that year's goals, Heideman was informed he would be expected to produce at the same levels as in 1984. The next month, Heideman complained to Dr. Evert that he was fatigued, sleeping poorly and under pressure at work. Notes in Heideman's appointment book, admitted into evidence, reflect that in May Shannon told him "it would be my job on the line" if he did not increase his sales. Heideman stated he reminded Shannon of his medical restrictions and was told, "Hey, that's fine, Jim. If you have to work less hours, you can. But you've got to produce. You have to meet our goals." In March 1985, Heideman received a letter from the chairman and chief executive officer of American Family. The letter, congratulating Heideman on fifteen years of service to the company, commended Heideman for his loyalty and stated that "[t]hrough your hard work and dedication, [American Family's increasing] challenges are continuously met."

On August 12, 1985 at a quarterly review meeting, Heideman questioned Shannon about Harvey Schultz, another agent in Heideman's office. Schultz had had a

heart attack and open-heart surgery about the time of Heideman's heart attack. Although Schultz had a manager other than Shannon, Heideman testified that he asked Shannon why "you're pushing me for life insurance when [you] aren't doing that to Mr. Schultz." Heideman was told not to "worry about another agent. That's none of your business." Heideman then offered to submit to an independent physical examination "because I could sense that [Shannon] had the feeling that I wasn't telling him the truth." Instead, Shannon requested another letter from Dr. Evert.

Dr. Evert submitted a letter dated October 7, 1985. In it, he recommended that Heideman restrict his work schedule to "approximately 6 hours per day in the office." Heideman forwarded a copy to Shannon. Shannon, in turn, forwarded the letter to Jerry Cutsforth, the state director, along with a handwritten message stating:

> Jerry, I've got a "gut" feeling that Jim initiated this letter from the Dr. so I would get off his back for production! In a discussion with Jim a week ago, he stated, "I've started something to enable me to slow down." I truly believe this is his doing NOT the Dr. (ANY SUGGESTIONS?!) [Emphasis in original.]

Shannon then notified Heideman that Cutsforth wished to meet to discuss the most recent communication from Dr. Evert.

At that meeting, held October 25, 1985, Cutsforth told Heideman that they could accommodate his medical limitations for "a short period of time . . . but a month or so down the road" he would be expected to produce at the level required of all other agents because "[t]his business that we're in requires new business be written." Heideman testified that he understood the substance of the meeting to be that "either your production has to

come up, or your agency will be taken away from you." A memo Cutsforth prepared after the meeting indicated that at one point during the discussion Heideman became irrational and began to cry.

In January 1986, the production standing report ranked Heideman ninth out of the seventeen agents. In early February, Shannon warned Heideman that his production must improve or Heideman would be "in big trouble." On Friday, February 14, 1986, while at a district meeting to discuss the various agents' production, Heideman hyperventilated and was taken by ambulance to a hospital and was admitted. Heideman discharged himself against medical advice, however, because he was "very, very afraid" of losing his job.

Upon his return to work the following Monday, he received a report regarding 1985–86 cumulative production. The report showed that of the seventeen agents, Heideman's rank had fallen from fourth in January 1985 to fourteenth in January 1986. Across the bottom Shannon had added the notation: "This report speaks for itself. If you like your job and want to keep it, I would suggest you start to get serious about life insurance!!" Heideman testified that he told Shannon that he "couldn't take the pressure, and [Shannon] said that shit flows downhill and I had better adjust."

In April, Shannon again told Heideman he was disappointed in Heideman's production. Likewise, by letter dated April 18, 1986, Cutsforth termed Heideman's production

> a disappointment to me. Your production, or lack of it, indicates the possibility of several problems, such as—poor attitude, lack of commitment, poor effort, and/or failure to recognize the importance of being a team member. These problems would all add up to being unprepared . . .. In the future, I expect your

production to be at least average . . .. Now let's get on with it and have a great 1986.

Heideman responded with a letter to Shannon stating that his doctor's instructions left him unable to meet the minimum production requirements, and their continued demands that he do so put "undue strain on my working ability and now has greatly affected my family, as well." Heideman's letter also challenged the suggestion that he was suffering from a poor attitude or effort, and stated that he would "do the best I can under the circumstances, without putting my health and wellbeing in jeopardy."

Finally, on June 2, 1986, American Family revoked Heideman's authority to act as an agent. Heideman sued American Family in tort, alleging that by its extreme and outrageous acts, it had intentionally inflicted emotional distress upon him. After a three-day trial, the twelve-person jury found in Heideman's favor and awarded him $150,000 in compensatory damages and $500,000 in punitive damages. American Family sought to have the answers to the verdict changed. In the alternative, it requested a new trial.

At motions after verdict, heard on May 25, July 9 and July 20, 1990, the trial court reviewed the three-question special verdict.[1] The court construed the law to require that to establish "intent," American Family's sole or main purpose had to be to cause emotional dis-

---

[1]The special verdict comprised the following three questions:

QUESTION NO. 1: Were American Family's actions toward James Heideman intended to cause emotional distress?

QUESTION NO. 2: Were American Family's actions toward James Heideman extreme and outrageous?

QUESTION NO. 3: Were American Family's actions a cause of extreme and disabling emotional distress to James Heideman?

tress, and concluded that American Family's conduct was primarily motivated by a legitimate purpose—to make Heideman produce more. From that premise, the trial court determined that the credible evidence did not show that American Family's conduct was "extreme and outrageous." The trial court ultimately changed the answers to the first two of the three special verdict questions from "yes" to "no."

In the alternative, the trial court then ruled that should the verdict be sustained on appeal on the grounds that American Family's conduct was motivated by an illegitimate purpose such as a desire to strip Heideman of his agency, it would order a new trial. In that case, the court reasoned, the special verdict answers would be against the great weight of the evidence.

Finally, in an advisory opinion, the trial court reduced the compensatory damages from $150,000 to $125,000 and the punitive damages from $500,000 to $75,000.

We first address a matter raised by American Family on the cross-appeal. American Family argues that the trial court lacked subject matter jurisdiction over the action because Heideman's exclusive remedy lay in the Worker's Compensation Act (WCA).

We disagree. The circuit court's ability to entertain the claim when it did is not a function of its subject matter jurisdiction, but its competency to proceed on the matter. No circuit court is without subject matter jurisdiction to entertain actions of any nature whatsoever. *Mueller v. Brunn,* 105 Wis. 2d 171, 176, 313 N.W.2d 790, 792 (1982). There is a difference between the situation where a court lacks power to treat a certain subject matter at all and the situation where a court may treat the subject generally but there has been a failure to comply

859

with the conditions precedent necessary to acquire jurisdiction. *Galloway v. State,* 32 Wis. 2d 414, 419, 145 N.W.2d 761, 763 (1966). "[O]nly in the former situation is it correct to say that there is a lack of subject-matter jurisdiction." *Id.* The legislature has the authority to set standards for exhaustion of administrative remedies or for primary jurisdiction prior to the proper invocation of the court system's subject matter jurisdiction, but the failure to follow these standards results not in a lack of jurisdiction but in a lack of competency to proceed to judgment. *See Mueller,* 105 Wis. 2d at 176–77, 313 N.W.2d at 792–93.

The issue of whether Heideman was an employee or independent contractor was never litigated. American Family's original answer pled exclusivity as an affirmative defense. Soon after, American Family changed lawyers. The new attorney did not further pursue the matter at any point prior to or during the three-day trial. Even if jurisdiction more properly rested in the Department of Industry, Labor and Human Relations—and we do not decide that it does—certain underlying factual questions should have been answered first. Yet American Family did not put those questions before the court or the jury. Instead, it allowed the issue to lie dormant throughout the trial. Not until motions after verdict did American Family again raise the issue, at which time it sought dismissal based on lack of subject matter jurisdiction.

Heideman's counsel stated that he had put in no evidence on the issue in reliance on American Family's apparent abandonment of the exclusivity defense. The trial court ruled that American Family was thus estopped from challenging the court's subject matter jurisdiction. Estoppel is action or nonaction which induces another's reliance thereon, either in the form of

860

action or nonaction, to his detriment. *In re Alexander,* 75 Wis. 2d 168, 176, 248 N.W.2d 475, 480 (1977). We agree, and conclude that by its seeming abandonment of the defense, American Family is estopped from asserting on motions after verdict that Heideman's exclusive remedy lay in the WCA.[2]

We now turn to the other issues on appeal. Heideman's action against American Family is based on the tort of intentional infliction of emotional distress. In Wisconsin, the test of liability in such cases is:

> One who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from it.

*Alsteen v. Gehl,* 21 Wis. 2d 349, 358, 124 N.W.2d 312, 317 (1963) (emphasis omitted). Four factors thus must be established for an injured plaintiff to recover:

> (1) The plaintiff must show that the defendant's conduct was intentional; that is to say, the defendant behaved as he did for the purpose of causing emotional distress for the plaintiff.
> (2) . . . [T]he defendant's conduct must be extreme and outrageous. The average member of the

---

[2]The Wisconsin Supreme Court recently held that intentional injuries are within the purview of the Worker's Compensation Act and that emotional injuries specifically are covered. *Jenson v. Employers Mut. Casualty Co.,* 161 Wis. 2d 253, 260–61, 468 N.W.2d 1, 4 (1991). Thus, if American Family had properly preserved the issue, and if Heideman were determined to be an employee rather than an independent contractor, his common law action would be barred by the exclusivity provision of the Act, sec. 102.03(2), Stats. *See Jenson,* 161 Wis. 2d at 263, 468 N.W.2d at 5.

community must regard the defendant's conduct in relation to the plaintiff, as being a complete denial of the plaintiff's dignity as a person . . ..

(3) The plaintiff must demonstrate that the defendant's conduct was a cause-in-fact of his injury . . .. A person who bullies another who is emotionally vulnerable shall be deemed liable for intensifying a pre-existing condition of psychological stress . . ..

(4) The plaintiff must demonstrate that he suffered an extreme disabling emotional response to the defendant's conduct. The severity of the injury is not only relevant to the *amount* of recovery, but is a necessary element to *any* recovery. The plaintiff must demonstrate that he was unable to function in his other relationships because of the emotional distress caused by defendant's conduct. Temporary discomfort cannot be the basis of recovery.

*Id.* at 359–60, 124 N.W.2d at 318 (emphasis in original).

The four *Alsteen* elements were incorporated into the three-question special verdict. The jury answered all three questions in the affirmative. On motions after verdict, the trial court initially determined that there was sufficient evidence to support the jury's answers on the second and third questions, representing the second, third and fourth *Alsteen* factors. On the first question, however—whether American Family's actions were intended to cause Heideman emotional distress—the trial court changed the jury answer from "yes" to "no." The court reasoned that American Family's primary objective was to urge Heideman to sell more insurance, and based upon its reading of the case law, determined that:

intending to cause distress is not sufficient . . .. That it has to be the end itself. Simply using intentional infliction as a means to an end is not sufficient. *The*

*intentional infliction has to be the end in itself. It has to be the purpose for the defendant's behavior.* And I'm satisfied . . . that a jury finding that the purpose of the conduct was anything other than motivating the plaintiff to sell would be totally unsupported by the evidence, because I don't see any inferences in that record that they had any other purpose. [Emphasis added.]

The motion hearing was then adjourned for further briefing. When it resumed two months later, the trial court also changed the answer to the second question, whether American Family's conduct was "extreme and outrageous." In addition, the trial court reiterated its belief that to satisfy the *Alsteen* intent element, the "ultimate objective" had to be to inflict emotional distress. Here, however, the trial court concluded that "since there was a legitimate purpose, certainly it's legitimate to get a salesman to sell, that that immunized any intentional behavior which was intended to make him nervous." We conclude that the trial court's analysis of the intent prong represents a faulty reading of the law. We also conclude that the jury properly could have determined that American Family's conduct was extreme and outrageous.

Our standard of review of a jury verdict is that the verdict will be sustained if there is any credible evidence to support it. *Fehring v. Republic Ins. Co.,* 118 Wis. 2d 299, 305, 347 N.W.2d 595, 598 (1984). Where more than one reasonable inference may be drawn from the evidence adduced at trial, we must accept the inference drawn by the jury. *Id.* at 305–06, 347 N.W.2d at 598. Our duty is to search for credible evidence to sustain the jury's verdict, and we may not search the record for

evidence to sustain a verdict the jury could have reached but did not. *Id.* at 306, 347 N.W.2d at 598.

At the adjourned postverdict motion hearing, the trial court changed the answer to the second question of the special verdict, stating that "the best that could be said from [Heideman's] standpoint is that [American Family's] conduct was unreasonable, which *[Alsteen]* says isn't good enough." We disagree. Dr. Evert issued written cautions that Heideman's health was at stake. Heideman himself protested on several occasions that his health would not bear added pressure. Nonetheless, Shannon continued to demand high production and to threaten Heideman with the loss of his agency. Shannon's own memo reveals that he disbelieved Heideman's medical limitations.

As to the first special verdict question, the trial court initially acknowledged that there existed sufficient evidence for the jury to conclude that American Family intended by its behavior "to make [Heideman] nervous and worried, which constitutes infliction of emotional distress." We agree. However, the trial court then went on to say that although American Family intended the conduct which caused Heideman emotional distress, the "intent" prong nonetheless was not met. It reasoned that its primary goal—simply trying to make Heideman sell more insurance—was a "legitimate purpose" and therefore "immunized" American Family against a charge of intentional infliction of emotional distress.

We diverge from the trial court's view of the law. The trial court found the purpose of the conduct to be an indication of intent. We see purpose more as an indication of whether or not the conduct is extreme and outrageous. *Intent* is an essential element of the cause of action; the *purpose* of the conduct—although relevant—is not an element. The same conduct might be

considered appropriate in one context, yet in another context—motivated by another purpose—extreme and outrageous. To illustrate, a jury might deem firing a gun at a person acceptable conduct if the purpose were to frighten off an intruder. The same act likely would be found to be extreme and outrageous conduct if the goal were to frighten an employee into working harder. Here, the jury determined that American Family intended to cause Heideman emotional distress *and* that its conduct to achieve that end was extreme and outrageous. There is ample credible evidence to support each of those findings.

Accordingly, we disagree that to satisfy the intent prong an illegitimate intent must be the only—or the primary—motivation. We conclude that if conduct found by the jury to be extreme and outrageous was intended to, and did, cause emotional distress, a legitimate goal does not "immunize" the actor, even if the paramount aim is legitimate.

At the adjourned hearing, the trial court, alternatively, ordered a new trial because the great weight of the evidence indicated that the aim was to get Heideman to sell more insurance, not to unscrupulously deprive Heideman of his agency. When a trial court grants a new trial on the grounds that the jury's verdict is contrary to the great weight and clear preponderance of the evidence, we will not reverse the order unless it is clearly an abuse of discretion. *Markey v. Hauck,* 73 Wis. 2d 165, 171-72, 242 N.W.2d 914, 917 (1976). It is an abuse of discretion if the trial court applies the wrong legal standard. *Oostburg State Bank v. United Sav. & Loan Ass'n,* 130 Wis. 2d 4, 11-12, 386 N.W.2d 53, 57 (1986). It also is an abuse of discretion if the trial court substitutes its

judgment for that of the jury. *Markey,* 73 Wis. 2d at 172, 242 N.W.2d at 917.

Both occurred here. The trial court applied the wrong legal standard when it misapprehended the role that "purpose" plays in the four *Alsteen* factors, and it substituted its judgment for the jury's when it stated that there was "no possible basis on which a jury could conclude that [intent to inflict emotional distress] was the purpose of the defendant's behavior." Either is sufficient to find an abuse of discretion. We reverse the order granting the new trial.

Finally, we consider the remaining issues on the cross-appeal. These are whether any credible evidence supports the finding that Heideman suffered a severely disabling emotional response; whether the trial court's "advisory opinion" on damages employed the correct standard of review; and whether punitive damages are constitutional.

As to the first issue, the jury found that American Family's actions caused Heideman extreme and disabling emotional distress. We must sustain this verdict if there is any credible evidence to support it. *Fehring,* 118 Wis. 2d at 305, 347 N.W.2d at 598. There is.

This level of emotional distress is "anxiety of such substantial quantity or enduring quality that no reasonable person could be expected to endure it." *Evrard v. Jacobson,* 117 Wis. 2d 69, 73, 342 N.W.2d 788, 791 (Ct. App. 1983). American Family points out that Heideman testified that he continued to engage in everyday activities such as washing the car, taking the dog to the veterinarian and keeping doctor and dentist appointments. Heideman also testified, however, that in response to the pressure placed on him at work he suffered memory loss

and sleep disorders; became addicted to a tranquilizer; withdrew from his family; was told by his doctor that he "look[ed] terrible;" and by the end of 1984 was "burned out . . .. I felt I had regressed almost back to having the heart attack." We conclude that under these circumstances, this array of symptoms—endured for several years—constitutes severe emotional distress sufficient to support the jury's verdict.

The next issue involves the damages award. On motions after verdict, the trial court issued what it termed an "advisory opinion" on damages. Concluding an appeal was likely on the liability issue, the trial court reasoned it would be:

> only prudent to give the Court of Appeals an advisory decision . . .. I would hope that would all be briefed at the same time that Mr. Hammes [Heideman's attorney] would appeal the Court's actual decision, and also appeal the advisory one . . .. Maybe they would say, well, that's not a final judgment . . .. I'm trying to avoid the necessity of a second appeal.

The court then gave what it felt were more reasonable sums for the compensatory and punitive damages. American Family moved to have them further reduced.

Our review of the record indicates that the trial court's commentary on the damages award was precisely what it said it was: a nonbinding advisory opinion. The trial court expressly acknowledged that the opinion "doesn't have any official status at all." As such, and as the trial court anticipated, the commentary does not form a proper basis for American Family's appeal of this issue. Thus, we need not address American Family's contention that the trial court erred by giving deference to the jury's damages award.

In its final issue, American Family contends the punitive damages award offends the due process clauses of the state and federal constitutions. American Family acknowledges that punitive damages recently have been upheld as not violative of due process. *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. —, —, 111 S. Ct. 1032, 1044 (1991). American Family notes, however, that the *Haslip* Court refused to determine the issue with finality, and expressly limited its review of the constitutionality of the damages to the facts of that case. *Id.* at —, 111 S. Ct. at 1043. American Family urges, therefore, that we find the punitive damages award in this case unconstitutional. We are not persuaded.

In *Haslip,* involving insurance fraud, the Court did state that it would be "inappropriate" to say that punitive damages are "never unconstitutional" and that, when the case is tried to the jury, "reasonableness and adequate guidance from the court . . . properly enter into the constitutional calculus." *Id.* Haslip proved actual expenses of $4,000, yet was awarded a total of $1,040,000. The Court noted that the punitive damages portion of the award was more than four times the amount of compensatory damages, more than two hundred times Haslip's out-of-pocket expenses, and "much in excess" of the fine that could have been imposed. *Id.* at —, 111 S. Ct. at 1046. Nonetheless, the Court held:

> While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria. We conclude, after careful consideration, that in this case it does not cross the line into the area of constitutional impropriety.

*Id.*

Here, the jury determined Heideman's compensatory damages to be $150,000 and awarded punitive dam-

868

ages of $500,000. Thus, the chasm between the two amounts was far less dramatic than that found permissible in *Haslip.*

Furthermore, the jury was instructed that, in its discretion, it could award punitive damages if it found American Family's conduct "malicious[ ] or in wanton, willful or reckless disregard of the plaintiff's rights."[3] It was also instructed that the purpose of punitive damages is to "punish a wrongdoer or deter the wrongdoer and others from engaging in similar conduct in the future," not to compensate the plaintiff for the loss sustained. Wis J I—Civil 1707. Finally, the jury was told that if it deemed punitive damages proper, it should consider the grievousness of American Family's actions, the degree of malicious intent or recklessness of its actions, actual damage and American Family's ability to pay. American Family's wealth was a permissible consideration. *Id.* Such instructions "enlighten[ ] the jury as to the punitive damages' nature and purpose, identif[y] the damages as punishment for civil wrongdoing of the kind involved, and explain[ ] that their imposition [is] not compulsory." *Haslip,* 499 U.S. at —, 111 S. Ct. at 1044.

As noted in *Haslip,* these instructions permit the jury significant discretion. *Id.* The discretion is not unlimited, however, but is confined to deterrence and

---

[3]The jury was instructed that:

> Acts are malicious when they are the result of hatred, ill will, a desire for revenge, or inflicted under circumstances where insult or injury is intended. A person's conduct is wanton, willful, and in reckless disregard of the plaintiff's rights when it demonstrates an indifference on his part to the consequences of his actions, even though he may not intend insult or injury.

Wis J I—Civil 1707.

retribution, the state policy concerns sought to be advanced. *Id.* The Court further stated:

> The discretion . . . is no greater than that pursued in many familiar areas of the law as, for example, deciding "the best interests of the child," or "reasonable care," or "due diligence," or appropriate compensation for pain and suffering or mental anguish. *As long as the discretion is exercised within reasonable constraints, due process is satisfied.*

*Id.* (emphasis added; footnote omitted). We see no evidence that the jury did not exercise its discretion within reasonable constraints. Due process was satisfied.

In conclusion, we reverse the judgment and remand for reinstatement of the jury verdict.

*By the Court.*—Judgment reversed and cause remanded with directions.