**CONTINENTAL TREND RESOURCES, INC.; Harold G. Hamm, Trustee of the Harold G. Hamm Revocable Inter Vivos Trust; Gary H. Wright; Cindy Wright; Jeffery B. Hume; and Farrar Oil Company, Plaintiffs,**

**v.**

**OXY USA, INC. and Williams Natural Gas Company, Defendants.**

**No. CIV–90–1006–A.**

United States District Court, W.D. Oklahoma.

Oct. 20, 1992.

Eric S. Eissenstat, Burck Bailey, Fellers, Snider, Blankenship, Bailey & Tippens, Allan DeVore, Devore Law Firm, Oklahoma City, OK, Rand E. Moeder, Continental Trend Resources, Inc., Enid, OK, Daniel H. Margolis, David B. Robinson, Patton, Boggs & Blow, Washington, DC, for plaintiffs.

John T. Edwards, James M. Peters, Robert C. Smith, Jr., Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, OK, Ronald L. Wilcox, Robert F. Hill, Hill & Robbins, Denver, CO, Mark E. Greenwold, W. DeVier Pierson, Pierson Semmes & Bemis, Washington, DC, for defendant Oxy USA, Inc.

John T. Schmidt, Conner & Winters, Mary J. Rounds, Lester, Bryant & Ganz, D. Richard Funk, Conner & Winters, Tulsa, OK, for defendant Williams Natural Gas Co.

## ORDER DENYING MOTION TO ALTER OR AMEND JUDGMENT, FOR REMITTITUR, FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

ALLEY, District Judge.

### I. INTRODUCTION

At issue is defendant Oxy USA Inc.'s ("Oxy") motion to alter or amend judgment, for remittitur, for judgment as a matter of law ("JMOL") or for a new trial,* which is at issue upon briefs and after oral argument.

### II. BACKGROUND

Plaintiffs are independent producers and marketers of natural gas and liquid byproducts. Defendants process, market and transport natural gas. Defendant Williams Natural Gas Company ("WNG") owns and Oxy operates and maintains the Rodman Gathering System, which is a gas-gathering or collection and transmission pipeline system that distributes gas to intrastate and interstate markets. Defendant Oxy co-owns the Rodman Plant, which is at the outflow of the gathering system, with Oryx, a non-party to the present suit. Oxy solely operates and maintains the plant, which can perform compression and treatment of gas that may be necessary to meet the gathering system's transmission line quality specifications and pressure standards imposed by the Federal Energy and Regulation Commission ("FERC"). The transmission system is a regulated, non-discriminatory, open-access transporter of gas subject to FERC's gas tariffs.

---

* Defendants originally moved in part for judgment notwithstanding the verdict ("JNOV"), but on December 1, 1991, the motion was recharacterized pursuant to statute as a JMOL. *See* 28 U.S.C. Fed.R.Civ.P. 50(b) (revised, effective Dec. 1, 1991). This Order shall interchangeably refer to both procedural devices, but they are essentially the same. Likewise, at trial, defendants moved for a directed verdict, which has now also been recharacterized as a motion for JMOL. *See id.* at 50(a). Technically, at the post-trial stage the motion is simply renewed. *Id.*

This case was filed with both federal and pendent state claims.

On March 26, 1991, the Court denied plaintiffs' motion to bifurcate or abstain. *See Lis v. Robert Packer Hosp.*, 579 F.2d 819, 823–24 (3d Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 354, 58 L.Ed.2d 346 (1978); *Organic Chems., Inc. v. Carroll Prods., Inc.*, 86 F.R.D. 468, 469 (W.D.Mich.1980). On April 17, 1991, the Court granted partial summary judgment to defendants Oxy USA, Inc. and Williams Natural Gas Company on plaintiffs' antitrust claims. *See Continental Trend Resources, Inc. v. Oxy USA, Inc.*, No. CIV–90–1006–A, 1991 WL 191242, 1991 U.S. Dist. LEXIS 15203; 1991–2 Trade Cas. (CCH) ¶ 69,510 (W.D.Okla. Apr. 17, 1991). A jury trial was held from April 8–29, 1991 on plaintiffs' claims of tortious interference with contracts and tortious interference with prospective business advantage, and Oxy's breach of contract counterclaims. The Court directed a verdict for defendant Williams Natural Gas Company at the conclusion of plaintiffs' case-in-chief. *See* Trial Transcript at 1662 (Apr. 23, 1991).

Following trial, the jury returned a unanimous verdict for plaintiffs for $269,000 in actual damages, and $30 million in punitive damages. Ironically, on the eve of jury selection, plaintiffs represented to the Court that it lacked jurisdiction to entertain pendent state claims because the Court had granted summary judgment to defendant on the federal claims. With a further note of irony, Oxy argued that plaintiffs were afraid to face their day of reckoning. Plaintiffs' motion to dismiss was denied by the Court and sanctions were awarded to defendant Oxy for having its litigation-preparation time disrupted by a last-minute motion that was absolutely meritless. In substantial part, defendant Oxy received the benefit of the majority of the Court's rulings, including ones overruling plaintiffs' objections to jury instructions. Consequently, plaintiffs had to overcome a rather heavy burden and had to convince eight jurors, two more than the legal minimum, that their claims were meritorious.

## III. STANDARDS OF REVIEW FOR MOTIONS FOR JMOL OR JNOV, REMITTITUR, AND NEW TRIAL

"Motions for a directed verdict and for judgment n.o.v. are considered under the same standard." *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 498 (10th Cir.1984). The standard was summarized by the Tenth Circuit in *Rajala v. Allied Corp.*, 919 F.2d 610 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). The test is whether there is evidence upon which the jury could properly find a verdict for the party opposing the motion for directed verdict or motion for JMOL or JNOV. *Id.* at 615.

In making that determination the court "may not weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury," but rather "must view the evidence most favorably to the ... [nonmoving] party and give that party the benefit of all reasonable inferences from the evidence." *Brown v. McGraw–Edison Co.*, 736 F.2d 609, 613 (10th Cir.1984); *accord, e.g., Sandlin v. Texaco Ref. & Mktg., Inc.*, 900 F.2d 1479, 1483 n. 5 (10th Cir.), *cert. denied*, 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990). "Jurors are charged with the exclusive duty of assessing the credibility of witnesses and determining the weight to be given testimony, taking into consideration the appearance and general demeanor of each and every witness." *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144, 1149 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978).

The Court may not substitute its judgment for that of the jury even if the Court may have reached a different conclusion had the case been tried solely to the Court. *See, e.g., Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 186 (8th Cir.1972) (merely because the jury could have drawn different inferences or conclusions or because the court believes that another result is more reasonable is no basis for granting a new trial) (citing *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520

(1944)), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). "The jury—or the court if the case is tried without a jury—has the *exclusive* function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of facts." *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.,* 571 F.2d at 1149 (emphasis in original).

■ The motion for JMOL may not enlarge or assert new matters not presented in the JMOL urged at trial or in the motion for directed verdict. *U.S. v. Fenix & Scisson, Inc.,* 360 F.2d 260, 265 (10th Cir.1966), cert. denied, 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599 (1967) 9 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 2d* at § 2537, p. 598 (1971) ("Since [the motion for JNOV] is technically only a renewal of the motion for directed verdict made at the close of the evidence, it cannot assert a ground that was not included in the motion for directed verdict.") (footnote omitted). One of the purposes of this rule is to allow the prevailing party the opportunity to correct deficiencies prior to the submission of the case to the jury. *Anderson v. United Telephone Co.,* 933 F.2d 1500, 1503 (10th Cir.1991); *see generally Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 826 F.2d 712, 716 (7th Cir.1987) ("A party that fails to state its objection to jury instructions specifically cannot challenge the jury's verdict on that issue."); *Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373, 1385 (10th Cir.1989) (a specific motion for JMOL at trial or directed verdict is sufficient to preserve the issue of the sufficiency of the evidence to support a punitive damages award).

■ When considering the excessiveness of the amount of a damages award, the Court must determine whether it resulted from jury passion, bias or prejudice so as to taint the finding of liability. If such is found then a new trial is required; otherwise, any excessiveness may be cured through a remittitur within the sound discretion of the Court if the reduced amount is acceptable to plaintiff. *See Mason v. Texaco, Inc.,* 948 F.2d 1546, 1560–61 (10th

Cir.1991), *petition for cert. filed,* —— U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 1991 U.S.App. LEXIS 27,011 (U.S. Mar. 9, 1992); 11 C. Wright & A. Miller, *Federal Practice & Procedure: Civil 2d* at § 2815 (1973) ("A remittitur gives the plaintiff a choice. He [or she] can refuse to accept the reduced amount of damages and instead proceed to a new trial."). The district court's ruling on a motion for directed verdict or for JMOL or JNOV is reviewed *de novo* by the Tenth Circuit, applying the same standard as that used by the district court. *Rajala v. Allied Corp.,* 919 F.2d at 615; *Sandlin v. Texaco Ref. & Mktg., Inc.,* 900 F.2d at 1483 n. 5; *Brown v. McGraw–Edison Co.,* 736 F.2d at 613.

## IV.  ANALYSIS

### A.  *Denial of Motion for JMOL*

Applying the JMOL standard to the facts in the record and carefully considering the briefs of the parties, the Court finds that the jury's verdict on plaintiffs' claims is rationally based, not driven by bias, prejudice or passion, or improper motive, and should stand. The Court previously assessed the sufficiency of the evidence at the directed verdict stage following plaintiffs' case-in-chief and found the evidence to be totally adequate as to Oxy with regard to the claims presented to the jury. The Court partially directed a verdict to Oxy with regard to some damage issues involving Exxon and Enogex. *See* Trial Transcript at 1666 (Apr. 23, 1991). The Court also fully directed a verdict for defendant Williams Natural Gas Company. *See* Trial Transcript at 1662–66 (Apr. 23, 1991). At the close of all the evidence being introduced, the Court found that there was clear and convincing evidence of Oxy's misconduct. For the last time, the Court finds the evidence to be legally sufficient.

■ Procedurally, Oxy moved for a directed verdict at the end of plaintiffs' case in chief on April 23, 1991, but critically failed to reassert its motion at the end of all the evidence, and therefore the motion for JMOL cannot be successfully raised at

the post-trial stage. *See Anderson v. United Tel. Co.*, 933 F.2d at 1503; *United States ex rel. Roper, IBG v. Reisz*, 718 F.2d 1004, 1007 (11th Cir.1983); *Special Promotions, Inc. v. Southwest Photos, Ltd.*, 559 F.2d 430, 432 (5th Cir.1977); *see* advisory committee's note to former Fed. R.Civ.P. 50(b) ("A motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made at the close of all the evidence."). The motion is therefore deficient under both adjective and substantive measures.

## B. *Denial of Motion For New Trial*

Oxy moves for a new trial based on the excessiveness of the punitive damages award and unfair surprise in that connection; misconduct of counsel; improper jury instructions; and surprise regarding the Mosier Farms contract. None of these arguments has merit.

The Court finds that Oxy has waived its First Amendment and Equal Protection Clause arguments by not pressing them at trial. *See Cunningham v. Healthco, Inc.*, 824 F.2d 1448, 1458 (5th Cir.1987) ("[D]efenses not raised or argued at trial are ordinarily waived by the parties failing to raise them."); *Mason v. Texaco, Inc.*, 741 F.Supp. 1472, 1518 (D.Kan.1990) (failure to object on constitutional grounds is a waiver), *aff'd in part and modified in part, remanded for remittitur or new trial*, 948 F.2d 1546 (10th Cir.1991), *petition for cert. filed, cert. den.*, —— U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992). There was no specific objection made by Oxy concerning a requisite element of falsity with regard to its commercial speech.

Oxy's speech was not the type of commercial speech as defined in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) (price advertising); instead it was intended maliciously to interfere with legitimate commerce. Also, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974) does not support the limitation of an award of punitive damages against a corporation for tortious interference with contracts or prospective business advantage. Defamation is irreconcilable with the causes of action before this Court, because defamation has the potential of punishing unpopular ideas, which is abrasive to the Constitution. *Id.* Oxy has unpersuasively attempted to transpose First Amendment defamation law on to the law of tortious interference. Further, the attempt is imprecise at best because at issue here is a matter of purely private concern, which occupies a subordinate position on the scale of First Amendment values, and thus has reduced protection. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 & n. 5, 105 S.Ct. 2939, 2944 & n. 5, 86 L.Ed.2d 593 (1985). Punitive damages are supportable without a showing of actual malice in a purely private circumstance. *Id.* at 761, 105 S.Ct. at 2946.

Oxy's speech did not rise to the dignity of constitutional protection. In fact, certain utterances were tainted by fraud. The jury more likely than not found that Oxy fraudulently induced plaintiffs to enter certain contracts; other speech was malicious. *See Berry v. Stevens*, 168 Okl. 124, 124, 31 P.2d 950, 950 (1934) (per curiam) (Court's first syllabus) ("Fraud destroys the validity of everything into which it enters.").

Oxy's representative, Joe Garrett, repeatedly made oral and written communications to third-party gas purchasers designed to interfere with existing or prospective CTR Sales contracts, and threatened legal action if the third parties conducted any business with plaintiffs. The communications were less than truthful. The jury had substantial evidence before it from which to find that Joe Garrett intentionally failed to inform the third parties that Oxy was claiming an exclusive right to buy from plaintiff under terminated or expired contracts. Oxy provided to the third parties contracts in which Oxy was not a party and improperly asserted contractual rights under those contracts.

Under Oklahoma law when a person speaks there is a duty to disclose all known facts so as to not convey a false impression. *See id.*, 168 Okl. at 129, 31 P.2d at

955; *see also Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350, 1353–54 (Okla.1988) (within context of a cotenancy); *Mulkey v. Morris*, 313 P.2d 494, 500 (Okla.1957) (within context of a partnership). Oxy's representative breached this duty by not informing the third parties that: 1) Oxy had defrauded plaintiffs; 2) Oxy had improperly deducted gathering fees and thus materially breached certain contracts; and 3) Williams Natural Gas Company's contracts had been terminated, thereby automatically terminating Oxy's processing agreements. *See, e.g.*, Trial Transcript at 869–70 (Apr. 18, 1991); and 1669 (Apr. 23, 1991). Oxy also omitted other pertinent information that would have provided a complete and honest picture.

The Court further concludes that plaintiffs' counsel did not commit the degree of prejudicial misbehavior, including violation of this Court's Order in Limine regarding price-fixing litigation brought against Oxy by government agencies, that requires a new trial. Focused into perspective, this infraction was only a few words during a trial that spanned three weeks. The matter was stricken by the Court and the jury was admonished to disregard it. *See* Trial Transcript at 33 (Apr. 8, 1991); and 1463 (Apr. 23, 1991).

At trial, the Court twice made an offer to defendants to declare a mistrial on this issue, and twice Oxy argued that a mistrial was unnecessary. *See* Trial Transcript at 1418–19 (Apr. 22, 1991); and 1463–64, 1469–70 (Apr. 23, 1991). Oxy never offered any alternative remedy, except to request that the issue not be addressed any further in front of the jury. The Court granted that request and essentially gave Oxy everything for which it asked. Now, Oxy asks for more; in view of a particularly unpleasant verdict, Oxy believes that a new trial is necessary after all. This argument has now lost all force, and any defect that the Court might previously have been receptive to cure has long since been waived.

There was no objection to counsel's characterization of Oxy's witnesses, and the Court finds no error in this regard. The Court finds that the Mosier Farms contract claim was fairly contemplated within the Pretrial Order in the manner agreed to by the parties. Oxy withdrew its objection at trial. The pertinent evidence was introduced on the first day of a trial that spanned three weeks. Plaintiffs' witnesses were thoroughly cross-examined and there was an attempted impeachment. No continuance was requested, and the Court rejects Oxy's claim of surprise. *See Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1411 n. 13 (10th Cir.1988) (the cross-examination did not bear the marks of one who was surprised). Finally, Oxy produced evidence at trial that it had incurred lost profits and anticipated larger losses in the future, but the jury considered this evidence in reaching its determination. That determination need not be upset.

### C. *Due Process Safeguards*

■ The jury award in this case meets the requirements of due process by three separate measures.

1. Application of Oklahoma's Statutory Procedure Requiring Redundant Scrutiny of the Evidence by Independent Triers of Fact that includes a Heightened Burden of Proof.

First, on the record at trial, the Court found that there was clear and convincing evidence that showed Oxy was responsible for conduct evincing oppression and a wanton and reckless disregard of plaintiffs' rights. Consequently, the Court lifted the cap on punitive damages. Trial Transcript at 2068–69 (Apr. 25, 1991); *see* 23 Okla. Stat. § 9 (when jury may give exemplary damages). The Oklahoma Legislature has instituted this procedural safeguard to adequately insure that punitive damages awarded under state law are not excessive, and that ample due process safeguards are built into the judicial process. *See Marshall v. El Paso Natural Gas Co.*, 874 F.2d at 1382–84 ("In 1986 the Oklahoma legislature amended its punitive damages statute, 23 Okla.Stat.Ann. § 9 (1971), limiting the amount of punitive damages to the amount of actual damages awarded unless the court first should find clear and convincing

evidence of punitive acts prior to submitting the issue to the jury, in which case the limit of punitive damages to actual damages would not apply.").

Under proper circumstances the district court can even set a cap beyond the amount of actual damages on the award of punitive damages. For example, in *John A. Henry & Co. v. T.G. & Y. Stores Co.*, 941 F.2d 1068, 1070, 1073 (10th Cir.1991), the Tenth Circuit recognized a wrongful interference with contract claim that arose from this district. The trial court lifted the cap, but placed a $2 million limit on punitive damages. The jury returned a verdict of $100,000 for actual damages and $2 million for punitive damages, a 1:20 ratio. In rejecting defendant's argument that the trial court invaded the province of the jury by setting a certain limit on the award, the Tenth Circuit concluded by stating "[w]e see no error or improper suggestion in this form. If any prejudice occurred, it was to [plaintiff] because the jury was not permitted to exceed the $2,000,000." *Id.* at 1073.

The Court believes that the Oklahoma statutory framework is constitutional and is not in need of change; however, if any change to this scheme is found to be warranted, then it should be by the state legislative branch, and not by the judiciary. *See Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1384 n. 12 (5th Cir.1991) (on remand from the Supreme Court for reconsideration in light of *Pacific Mut. Life Ins. Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and noting that it is up to the legislature to set forth exact proportionality guidelines for punitive damage awards); *compare Flockhart v. Wyant*, 467 N.W.2d 473, 475 (S.D.1991) (finding statute similar to that of Oklahoma was constitutionally adequate) *with Fleming Landfill, Inc. v. Garnes*, 186 W.Va. 656, 413 S.E.2d 897, 900 (W.Va.1992) (as corrected) (adopting into West Virginia law the punitive damages factors noted in *Pacific Mutual*).

Had the Oklahoma Legislature wanted to place an arbitrary cap on punitive damages to cover every conceivable circumstance, then it might have done so. Instead, there was a purposeful legislative decision to keep the ceiling open-ended. Consequently, higher punitive damages may be awarded when warranted by the facts in light of the state's purposeful interest in individualized assessment of appropriate deterrence and punishment. *See Mason v. Texaco, Inc.*, 948 F.2d at 1559 (citing *Pacific Mut. Life Ins. Co. v. Haslip*, —— U.S. at ——, ——, 111 S.Ct. at 1043–44).

Another procedural safeguard under Oklahoma law is there can be no award of punitive damages without recovery of actual damages. *Phillips Mach. Co. v. LeBlond, Inc.*, 494 F.Supp. 318, 325 (N.D.Okla.1980) (citing *Moore v. Metropolitan Utils. Co.*, 477 P.2d 692, 694 (Okla.1970)). (However, punitive damages may be awarded in the event nominal damages are obtained. *See Spaeth v. Union Oil Co.*, 762 F.2d 865, 866–67 (10th Cir. 1985) (appeal after remand), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986)).

In determining the punitive damages issue at trial, the Court, in its role of trier of fact, objectively weighed the evidence, judged the credibility of the witnesses and assigned them weight. The Court determined that plaintiffs met their burden of proving by clear and convincing evidence that Oxy oppressively and recklessly disregarded plaintiffs' rights, so as justify lifting the punitive damages cap. *See* Trial Transcript at 2068–69 (Apr. 24, 1991). Subsequently, the jury, in its separate role of trier of fact, independently found by a preponderance of the evidence that Oxy tortiously interfered with plaintiffs' contracts and further tortiously interfered with plaintiffs' business relations with others. The Court reject's Oxy's argument that this procedure may infringe on its right to a trial by jury. The jury consequently awarded punitive damages. *See Marshall v. El Paso Natural Gas Co.*, 874 F.2d at 1382–84 (setting forth the statutory framework for determining punitive damages in Oklahoma). There was substantial evidence to justify the jury's determination.

The Court is mindful that punitive damages are not wholly favored in the law

because they constitute a windfall and may create the anomaly of excessive compensation, *see Las Palmas Assocs. v. Las Palmas Center Assocs.*, 235 Cal.App.3d 1220, 1258, 1 Cal.Rptr.2d 301, 323–24 (Cal.App. 1991), *review denied,* (Feb. 11, 1992), but punitive damages are deeply rooted in our legal system and if they are to serve their mission, then they should not be absorbed with little or no discomfort. *See Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984); *see also Coryell v. Colbaugh*, 1 N.J.L. 77 (1791) (first reported American case involving punitive damages). Even a multi-million dollar punishment may be viewed as a calculated risk by a huge corporation in the seedy politics of coercion of smaller businesses that cannot financially risk litigation despite a sincere belief that they have been wronged. In contrast, a judgment of $30 million against this defendant under the justifying circumstances of this case sends a sharp, but certainly not devastating, lesson of deterrence to this defendant and any other potential defendant who is like-minded and similarly situated.

2.  Well–Drawn Limits on Jury Discretion.

Second, the discretion of the jury was sufficiently tempered by the Court's purposefully crafted instructions. The jury's discretion in setting punitive damages was not unlimited, and was instead confined to deterrence and retribution. *See Heideman v. American Family Ins. Group*, 163 Wis.2d 847, 868–70, 473 N.W.2d 14, 23 (App.1991) (citing *Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. at ——, 111 S.Ct. at 1044). The Supreme Court has stated in pertinent part:

> The discretion ... is no greater than that pursued in many familiar areas of the law as, for example, deciding "the best interests of the child," or "reasonable care," or "due diligence," or appropriate compensation for pain and suffering or mental anguish. As long as the discretion is exercised within reasonable constraints, due process is satisfied.

*Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. at ——, 111 S.Ct. at 1044.

The eight-person jury—two more than legally required—deliberated for a day and a half, and on April 30, 1991 returned a unanimous verdict for plaintiffs for $269,-000 in actual damages, and $30 million in punitive damages. The jury was attentive during trial and approached its job seriously, as demonstrated by the fact that at one point during deliberations the jury requested to see the blow-ups of certain exhibits, and additionally asked to view certain depositions. *See* Trial Transcript at 1352 (Apr. 23, 1991). The jury's conduct and demeanor in the Court's view, were inconsistent with any exhibitions that would suggest passion or prejudice. To the contrary, the jurors were calm and rational. There is a strong presumption, unless there is evidence in contradiction, that the jury followed the Court's instructions in reaching its verdict. *See Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d at 1149, 1155 ("Appellate courts do not impute to a jury the inability to understand correctly the totality of the trial court's instructions, even in a complicated case, nor will courts impute nonfeasance, in the form of disregard of the trial court's instructions, to a jury.... It is presumed that jurors will be true to their oath and conscientiously observe the instructions and admonitions of the Court.").

The Court instructed the jury that plaintiff must show that the acts complained of were oppressive, wanton, or malicious. Jury Instruction No. 41 at 1 (Punitive Damages). Maliciousness was defined as being prompted or accompanied by hatred, ill will, or spite toward the injured person individually. Wantonness was defined as an act done in a reckless or callous disregard of, or indifference to, the rights of the injured party. Oppressiveness was defined as an act that injures, damages or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, disability or misfortune of another person. *Id.* at 1–2.

The jury was cautioned that punitive damages were not to be construed as compensation to the prevailing party, but rath-

er as punishment for misconduct and to serve as an example to others to deter them from similar conduct. *Id.* at 1. The Court instructed the jury that they *may* award punitive damages, but if so then only with sound reason and calm discretion, and not on the basis of sympathy, bias or prejudice. *Id.* at 2. In instructing on damages in general, the Court emphasized that any award must be just and reasonable, and not speculative, but instead must be based on the evidence introduced. Jury Instruction No. 36 at 2 (Damages). The Court took away from the jury those portions of plaintiffs' claims where the damages were too speculative or unwarranted. *See* Trial Transcript at 288–89 Apr. 12, 1991); 1365–68 (Apr. 22, 1991); and 1676, 1680 (Apr. 24, 1991). Further, the jury was instructed that punitive damages must bear some relationship to the injury caused by the offensive conduct as well as the conduct itself, but did not necessarily need to bear any relationship to the amount of actual damages awarded. Jury Instruction No. 41 at 2.

The Court believes that its handcrafted deliberation instructions placed meaningful procedural due process constraints on the discretion of the jury to award excessive punitive damages. *See Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. at —— & n. 1, 111 S.Ct. at 1037 & n. 1; *Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085, 1097–99 (5th Cir.1991) (the requirements are limits on jury discretion and adequate post-trial review), *cert. den.,* —— U.S. ——, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992). Oxy argues that its constitutional rights were abridged by the punitive damages instruction, but the Court agrees with plaintiffs that this argument has a bit of crocodilian flavor since Oxy was willing to use the same instruction to its advantage with regard to its conversion counterclaim that was dismissed by the Court at trial. *See* Trial Transcript at 1986, 2045 (Apr. 25, 1991); Oxy's Proposed Jury Instructions at 125, 137 (Mar. 6, 1991).

### 3. Post–Trial Intensive Review

Third, the Court has conducted this post-trial review of the award and finds it to be well-grounded in the evidence and not excessive under all of the circumstances; and it is reasonable in consideration of the character and degree of Oxy's wrongdoing, and the necessity of preventing similar conduct by not only this defendant but by others as well. *See Adams v. Murakami,* 54 Cal.3d 105, 112–13, 284 Cal.Rptr. 318, 322, 813 P.2d 1348, 1352 (1991) (en banc) (" 'The channeling of just the correct quantum of bile to reach the correct level of punitive damages is, to put it mildly, an unscientific process complicated by personality differences.' " (quoted citation omitted)).

### a. *Reasonableness of Award.*

■ There are four factors to consider in determining the reasonableness of an award of punitive damages under Oklahoma law. These factors shall be analyzed in turn.

### i. The Award is justified by the Cause and Extent of Plaintiffs' Injury.

The first factor to consider in determining reasonableness is the cause and extent of plaintiffs' injury. *See Hobbs v. Watkins,* 481 P.2d 746, 754 (Okla.1971); Trial Transcript at 1370–77 (Apr. 22, 1991); and 1560–65 (Apr. 23, 1991). In this case there was a purely commercial injury. Plaintiffs' causes of action were for tortious interference with existing contracts and tortious interference with prospective business relations. Both of these actions have contractual origins, but tortious misconduct was at work. Plaintiffs claim that their business was almost totally decimated by Oxy. *See* Trial Transcript at 283–84 (Apr. 12, 1991). The jury had evidence before it to find that Oxy deliberately shut-in plaintiffs' livelihood, and was less than truthful to third parties when plaintiffs attempted to conduct business with them. *See, e.g.,* Trial Transcript at 260, 282–83 (Apr. 12, 1991); 694 (Apr. 17, 1991); 1231, 1234–35, 1237, 1242 (Apr. 19, 1991); and 2054 (Apr. 25, 1991).

The jury had to find that Oxy's conduct was oppressive, wanton or associated with ill will or spite toward plaintiffs. *See* Jury

Instruction No. 41 at 1 (Punitive Damages). Oxy's behavior had to be found to be reckless or with callous disregard and indifference to the rights of plaintiffs. The jury had to find that Oxy intentionally and maliciously induced third parties to either fail or to refuse to perform contracts with plaintiffs, or find that Oxy otherwise intended to deprive plaintiffs of their expected benefits under the contracts. *See* Trial Transcript at 2052 (Apr. 25, 1991); Jury Instruction No. 21 at 1 (Interference With Existing Contract–Third Element).

The jury found that Oxy's conduct lacked justification, privilege or excuse when they found the counterclaim devoid of merit. *See* Jury Instruction Nos. 21 at 2–3 and 23 at 1 (Elements of Liability for Plaintiffs' Second Claim of Interference With Prospective Contractual Business Relations). The jury particularly had to find in this regard that Oxy did not have an honest intent and purpose of fairly bettering its own business, but instead found Oxy's purpose was to harm plaintiffs or wrongfully destroy honest competition. *See* Jury Instruction No. 21 at 1. The jury additionally had to find that Oxy did not have a legitimate economic interest in the subject matter of the relevant contract nor was Oxy seeking to protect its own contractual rights that might have been equal to or superior to the rights of plaintiffs. *See id.* at 3. The jury further had to conclude that Oxy's behavior was improper after balancing the evidence concerning the nature of the conduct, Oxy's motives, the interests interfered with, the interests sought to be advanced by the interference, the social interests served by protecting either party's interest, the relationship between the parties, and the proximity or remoteness of Oxy's conduct to the disruption of the subject contracts. *See id.*

The Court rejects Oxy's argument that it was unduly surprised by plaintiffs' cause of action for tortious interference of prospective business advantage, which Oxy argues is relatively new in Oklahoma. No legitimate business would consider Oxy's conduct to be proper—certainly plaintiffs did not think it so—and if Oxy is suggesting that it would have reformed its misbe-havior had it known it might be susceptible to a significant punishment, then that is precisely the point that must be conveyed to deter others. *See* 76 Okla.Stat. § 1 ("Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of [another's] rights."); *Restatement (Second) of Torts*, § 766B (1989) (Interference With Prospective Contractual Relations).

On the counterclaim that made it to the jury, Oxy claimed a $4 million economic loss based on its purported contractual rights to receive casinghead gas from plaintiffs' wells, which plaintiffs attempted to sell to third parties. Had Oxy prevailed on its counterclaim, then it would have had a complete defense to plaintiffs' claims. However, when plaintiffs' claims and Oxy's counterclaim are superimposed, the failure of proof on the counterclaim proves Oxy's injurious motive in a most convincing way. The jury was entitled to react to the fact that Oxy took a complete change of position with respect to the coterminous provisions of the contracts and whether the contracts retained validity. *See, e.g.,* Trial Transcript at 231–32 (Apr. 12, 1991); 658 (Apr. 16, 1991); 1228, 1242–43 (Apr. 19, 1991); and 2047–48 (Apr. 25, 1991). The counterclaim thus became counterproductive and was no doubt found to be offensive because Oxy asserted contractual rights under contracts that the jury probably found were procured by fraud in the first instance. *See, e.g.,* Trial Transcript at 2048–49, 2051 (Apr. 25, 1991); and at 30–31 (Sept. 13, 1991). Plaintiffs showed that Oxy failed to perform material obligations set forth in the contracts, including failure to pay for the gas taken, and improperly charged a gathering fee. *See, e.g.,* Trial Transcript at 283 (Apr. 12, 1991); 661 (Apr. 16, 1991); 2048 (Apr. 25, 1991); Jury Instruction No. 28 at 1–3 (Oxy's Breach Of Contract Counterclaim–Agreements And Issues Involved). After thoughtful consideration, the jury absolutely rejected Oxy's counterclaim. The jury had substantial evidence before it to find by clear and convincing evidence that Oxy fraudulently induced plaintiffs into entering certain contracts

with regard to the Mosier wells. *See* Jury Instruction Nos. 34 & 35.

No where in its extensive briefing has Oxy suggested that the jury reached the wrong result on its counterclaim. What surfaces is the disturbing conclusion that plaintiffs not only had to risk substantial legal costs to bring this suit, but were also faced with the possibility of a multi-million dollar adverse judgment on Oxy's counterclaims, which proved to be meritless. Just prior to trial, Oxy had been seeking nearly 7 million dollars in damages from plaintiffs. *See* Trial Transcript at 1855–56 (Apr. 24, 1991). Oxy was also pursuing its rights under terminated contracts in state court. *See id.* at 1789. Such tactics by a powerful tortfeasor serve to freeze all but the most intrepid of wronged parties. *See Spaeth v. Union Oil Co.,* 762 F.2d at 866 (the risk created by defendant's conduct is a substantial factor to consider in calculating punitive damages); *O'Gilvie v. International Playtex, Inc.,* 821 F.2d 1438, 1447 (10th Cir.1987) (probable litigation expense may be factored into the punitive damages calculus) (citing Kansas law), *cert. denied sub nom., Playtex Holdings, Inc. v. O'Gilvie,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988). It is fundamentally fair and just that this risk factor should be taken into account when assessing the totality of Oxy's conduct.

Finally, there was substantial evidence of the injury to plaintiffs caused by Oxy's conduct. The evidence showed that the injury was manifested in significant delays by third parties in hooking up to plaintiffs' wells, causing substantial damages to plaintiffs. For instance, Gary Baker testified that Oxy's conduct caused Union Texas to not buy plaintiff Continental Trends' gas, and Joe Garrett's tortious contact caused Union Texas to delay in purchasing Farrar Oil Company's gas. *See, e.g.,* Trial Transcript at 1301 (Apr. 22, 1991); and 2053–54 (Apr. 25, 1991). Other delays were caused as well. *See, e.g., id.* at 1334–35, 1337 (Apr. 22, 1991). There was substantial evidence that Oxy shut-in plaintiffs' wells. *See, e.g., id.* at 245, 247, 257, 258 (Apr. 12, 1991); 673 (Apr. 16, 1991).

At trial, Oxy admitted to making mistakes; otherwise Oxy has been utterly remorseless. *See id.* at 2049, 2061 (Apr. 25, 1991). Coercing weaker competitors to keep them in their place was Oxy's method of conducting business. *See, e.g., id.* at 1231 (Apr. 19, 1991). There is no question that plaintiffs proved defendant Oxy's injurious motive. The jury was obviously moved by the repugnancy of the totality of Oxy's conduct. The circumstances therefore beg the question: exactly how many tens of millions of dollars requite Oxy's incorrigibility? The jury answered three. This Court cannot disagree with that assessment.

### ii. The Award is Justified by the Harm Caused To Society.

The second factor to consider in determining the reasonableness of a punitive damages award is the harm Oxy's conduct caused to society in general. *See Oller v. Hicks,* 441 P.2d 356, 360 (Okla.1967) ("The basis for allowance of punitive damages rests upon the principle that they are allowed as punishment for the benefit of society as a restraint upon the transgressor, and a warning and example serving as a deterrent to commission of like offenses in the future."). The jury found that Oxy's intent was to improperly injure plaintiffs and thus wrongfully destroy honest competition. *See* Jury Instruction No. 21 at 3. It was therefore proper that the jury made an example out of Oxy in order to deter others from such grievous behavior that ultimately has an adverse economic impact on the public—the ultimate consumer of vital energy resources through public utilities.

At the same time, Oxy's conduct incrementally damages the United States in its present struggle to remain a global economic power. Of course, Oxy is not itself the cause of our society's economic problems, but Oxy's punishment does serve as an example to others to restrain them from crossing the boundary of unlawful interference and suppression of free enterprise. Our economic system's structure is as endangered by the nature of Oxy's conduct as by wrongful deaths or environmental hazards that Oxy insists should be reserved

for the highest penalties. It is true that Oxy's conduct does not create the personal tragedy represented in those other species of torts, but from a macro-perspective Oxy's misconduct is insidious because it rips at fair competition itself.

### iii. The Award is Justified by Oxy's Profit Incentive.

The third factor to consider is the magnitude of Oxy's profit incentive. Oxy itself introduced evidence that suggested that its profit incentive was in excess of $4.25 million. Plaintiffs argue that this amount does not include the gas that plaintiffs were unable to move from the system and were forced to process at the Rodman Plant due to Oxy's malicious interference. Plaintiffs contend that Oxy stood to ultimately profit by approximately $10 million from its unlawful conduct at the subject gas-processing plant, and therefore the award exceeds that amount by no more than three times. But, Oxy could only directly profit by a factor of 50% of the total amount as Oxy had a co-owner, Oryx. Therefore a more accurate multiplier would be six. However, the benefits that Oxy indirectly realized by unjustly enriching its co-owner defy quantification.

The evidence additionally suggests that Oxy improperly deducted gathering fees in the tens of millions of dollars. *See, e.g.,* Trial Transcript at 2048 (Apr. 25, 1991). Plaintiffs argue that Oxy's misconduct not only placed their business on the verge of collapse, but there was evidence that Oxy unjustly treated other producers in a similar manner and profited by millions of dollars. There is evidence that 6,000 contracts were affected, involving 100,000 producers. *See, e.g.,* Trial Transcript at 1756 (Apr. 24, 1991).

If left unchecked, Oxy could have profited by $80–90 million by the year 2010, according to plaintiffs. The large number of independent producers potentially affected therefore further substantiates a significant punitive damages award. *See O'Gilvie v. International Playtex, Inc.,* 821 F.2d at 1447; *Silkwood v. Kerr–McGee Corp.,* 769 F.2d 1451, 1460 (10th Cir.1985), *cert. denied,* 476 U.S. 1104, 106 S.Ct. 1947, 90

L.Ed.2d 356 (1986). This potentially widespread injury was a reasonable inference for the jury to draw from the evidence. Oxy disputes plaintiffs' ultimate conclusions, but the burden falls on Oxy with regard to overturning the jury award and that burden has not been met. "A verdict awarding punitive damages is not considered to be unconstitutionally excessive until the defendant against whom it has been rendered produces evidence that the amount is greater than a sum necessary to accomplish society's goals of punishment and deterrence." *Fraser v. Reynolds,* 588 So.2d 448, 452 (Ala.1991).

Oxy's corporate representative at trial, Joe Garrett, was not a strategic asset with respect to Oxy's culpability. In fact, the evidence admitted at trial portrayed both the representative and Oxy in a particularly bad light. *See* Trial Transcript at 31 (Sept. 13, 1991). Significantly, there was evidence that Oxy's representative believed, in effect, that Oxy could not allow plaintiff Continental Trend to get away with asserting its rights, or everybody else would try to assert theirs. Garrett specifically testified: "We have approximately 500 or so contracts at Rodman, and we live by the contracts that we sign with producers. *And if we let this happen with one producer, we could expect for everybody to want to jump right in the middle of us and do the same thing.* So we were trying to protect our plant." Trial Transcript at 1789 (Apr. 24, 1991) (emphasis supplied).

The indelible impression was that Oxy was concerned that the producers were getting restless; and therefore Oxy believed that it better get out there and subdue them, and did. The Court observed the jury during Joe Garrett's testimony and it was clear that the jury viewed him with justifiable disapprobation. *See* Trial Transcript at 30 (Sept. 13, 1991) (hearing on motions). The jury could well conclude that intimidation was Oxy's method of controlling competitors. Oxy's representative might have single-handedly assured a substantial punitive damages award against Oxy. After his testimony, Oxy's representative, who sat at counsel table, was a

constantly visible symbol of corporate misconduct, especially so during the final week of trial while a parade of witnesses testified as to his own misconduct. *See id.* at 30–31.

### iv. Oxy's Wealth Substantially Justifies the Award.

The last factor for the Court to consider in determining the reasonableness of the punitive damages award is Oxy's wealth. *See generally,* Annotation, *Punitive damages: relationship to defendant's wealth as factor in determining propriety of award,* 87 A.L.R.4th 141, § 31 (1991) (Net worth of assets of $1 billion or more.). Based on an equal protection foundation, Oxy argues that the jury should not have even been allowed to consider its net worth at the liability stage. Plaintiffs moved for bifurcation on Oxy's counterclaim, but Oxy never once asked for bifurcation, which would have been a rudimentary step for preserving an equal protection objection. *See Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 373–74 (2d Cir.1988).

On March 6, 1991, Oxy did file a motion in limine to exclude evidence of its parent corporation's net worth from being introduced, and to exclude evidence of its own financial position and condition *until after plaintiffs proved a prima facie showing of liability.* It was Oxy's position that such evidence was not even discoverable until liability was established. During the pretrial conference on April 1, 1991, the Court stated that it did not have enough information to make a decision at that time on the motion in limine and would simply defer an examination of punitive damages until after a liability determination. However, as a practical matter the motion was essentially granted because plaintiffs not only made a prima facie showing of liability, but after hearing arguments the Court found such by clear and convincing evidence in the record on April 25, 1991. *See* Trial Transcript at 2046–69 (Apr. 25, 1991). Thereafter, the Court ordered Oxy to produce evidence of its net worth by the following day. *See* Trial Transcript at 2069–70 (Apr. 25, 1991).

The Court rejects on the merits Oxy's contention that its right to equal protection was compromised by the jury being informed of its net worth at the liability stage. While Oxy argued in its motion in limine that such evidence would be prejudicial, there was no argument that it should be excluded on the constitutional grounds of equal protection nor excluded prior to the jury's verdict on liability. The basic issue raised is whether the jury would be unduly prejudiced by learning of the vast wealth of Oxy and then consequently return an adverse verdict on liability. This argument loses much of its force in the oil and gas context of the present suit, which is essentially a dispute between sophisticated business entities. A defendant's wealth in this context plays a decisively less prejudicial role than in such contexts, for example, as a manufacturer's product liability case where greed has perhaps placed profits above concerns for life and limb.

Oxy's argument is also curious on a logical plane. In effect, Oxy must convince this Court that the jury found liability on a preponderance standard, incited by prejudice, when this same Court previously determined that there was clear and convincing evidence of liability for punitive damages without the benefit of the evidence that Oxy asserts is so prejudicial. *See* Trial Transcript at 2069 (Apr. 25, 1991). In sum, the Court simply does not find that a constitutional right was abridged in this regard. *See also City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 270–71, 101 S.Ct. 2748, 2761, 69 L.Ed.2d 616 (1981). Again, this fundamental matter is best left to the legislature to change, if indeed, any change is warranted. Oxy likewise failed to raise this issue at trial and a party may not withhold assertion of a trial error and then urge the error upon review if the verdict proves unfavorable. *See Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir.1990) (error should be raised in a "pragmatically sufficient time."); *Nanda v. Ford Motor Co.,* 509 F.2d 213, 222 (7th Cir.1974); *Skogen v. Dow Chem. Co.,* 375 F.2d 692, 703 (8th Cir.1967) ("It is the most fundamental rule of appellate procedure that a party may not sit idly by and allow the trial

court to commit error, wait for a verdict, and complain of the error only if the verdict is unfavorable."), *superseded by statute on other grounds.*

The jury was correctly instructed that it could consider defendant's net worth pursuant to Oklahoma law as one of many factors in determining the amount of punitive damages to award, but the award must be warranted by the evidence. *See Spaeth v. Union Oil Co.*, 710 F.2d 1455, 1460 (10th Cir.1983), *appeal after remand*, 762 F.2d 865 (10th Cir.1985), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986). Oxy failed to raise a contemporaneous objection based on any lack of specificity in the instructions and further failed to submit a more detailed instruction that it now insists was required. *See* Oxy's Proposed Jury Instructions at 125, 137 (Mar. 6, 1991). Oxy's objection has simply been waived on this point. *See Rogers v. Northern Rio Arriba Elec. Coop., Inc.*, 580 F.2d 1039, 1042 (10th Cir.1978) ("It was only after an adverse jury verdict was returned that the matter assumed great importance...."); Fed.R.Civ.P. 51 (objections to jury instructions must be requisitely specific).

In reviewing instructions, the court should " ' " " 'consider all that the jury heard and, from the standpoint of the jury, decide, "not whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had an understanding of the issues and its duty to determine th[o]se issues." ' " ' " *Estate of Korf v. A.O. Smith Harvestore Prods.*, 917 F.2d 480, 484 (10th Cir.1990) (per curiam) (quoting *Robinson v. Audi NSU Auto Union Aktiengesellschaft*, 739 F.2d 1481, 1486 (10th Cir.1984) (quoting *Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir.1984) (quoting *Alloy Int'l Co. v. Hoover–NSK Bearing Co.*, 635 F.2d 1222, 1226–27 (7th Cir.1980) (and in turn quoting *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1100 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974))))). The review must be made " ' " "in the light, not only of the instructions as a whole, but of the allegations of the complaint, the opening statements, the evidence, and the closing argu-

ments." ' " *Estate of Korf v. A.O. Smith Harvestore Prods.*, 917 F.2d at 484 (quoting *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 682 (10th Cir.1981) (in turn quoting *Alloy Int'l Co. v. Hoover–NSK Bearing Co.*, 635 F.2d at 1226)). The instructions withstand review.

Significantly, Oxy never gave the Court any notice at trial of the problem of which it now complains nor the opportunity to correct any perceived error. *See Taylor v. Denver & Rio Grande W. RR. Co.*, 438 F.2d 351, 353 (10th Cir.1971) (the purpose of Rule 51 is to prevent a litigant from taking advantage of an error that could have been rectified if brought to the court's attention). During closing arguments, Oxy was permitted the opportunity to argue what other factors the jury might consider in reaching their determination. Opportunity once lost is forever lost. If any error is detectable, then it is harmless; so too with the Court's refusal to instruct on Oxy's theory of its case. *See* Fed.R.Civ.P. 61 (harmless error doctrine).

Oxy's net worth is a substantial factor for the jury to consider in determining the amount of punitive damages. *See Spaeth v. Union Oil Co.*, 762 F.2d at 866. In this regard, Oxy is a subsidiary of a giant American corporation—OXY Oil and Gas USA, Inc., which had a net worth of $1.756 billion in 1990 according to plaintiffs' Exhibit No. 256. Oxy's grandparent corporation, Occidental Petroleum Corporation of Los Angeles is reputed to be one of the Top Ten oil companies in the nation. *See generally*, Ronda Fears, *OXY Judgment May Be Largest In State History*, The Journal Record, May 3, 1991, at 1 (located at Oxy's brief at Ex. B). The financial worth of a parent corporation is generally irrelevant in assessing punitive damages on a subsidiary unless the corporate veil is pierced. However, as a practical matter, it was Oxy that pierced its parent's corporate veil by introducing evidence that commingled Oxy's financial information with that of its parent.

Oxy submitted a belated net worth statement that was introduced *without objection*. That report indicated that in 1990 Oxy distributed $589 million of excess cash

and $3.9 billion in assets to its parent corporation. The evidence indicated that Oxy's revenue for one week was $36 million. *See* plaintiffs' Ex. 256. During closing arguments, plaintiffs' counsel argued that Oxy should be penalized one week's revenue for its insufferable conduct. The jury apparently accepted that argument and the result is just and rationally based. In light of all of the circumstances of this case, the Court cannot find the sum of $30 million to be unreasonable, nor grossly disproportionate to the severity of the offense, and the sum is especially reasonable in relation to the $6 billion in assets of defendant in 1989 before it distributed $4 billion to its parent in 1990—the year this case was filed. *See id.*

Oxy has attempted to introduce evidence at this stage to show that the evidence presented at trial was misleading and confusing with regard to its net worth. The Court has reviewed this proffered evidence, but it more properly should have been introduced at trial under the Oklahoma punitive damages framework so that it could be subjected to cross-examination and consideration by the jury. *Cf. Pacific Mut. Life Ins. Co. v. Haslip,* — U.S. at — – —, 111 S.Ct. at 1044–45 (noting with approval that under Alabama law evidence of net worth is considered at the post-trial stage and upon appellate review, as opposed to the trial stage). The evidence of Oxy's net worth admitted at trial was not only uncontroverted, but there was no evidence proffered by Oxy at trial that plaintiffs' evidence in any form exaggerated Oxy's net worth. *See* Trial Transcript at 2075 (Apr. 25, 1991). Oxy allowed the strategic opportunity to introduce evidence on its financial condition to pass by. *See Jackson v. Johns–Manville Sales Corp.,* 781 F.2d 394, 408–09 (5th Cir.), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986).

Oxy unreasonably failed to produce evidence of its net worth when it was repeatedly requested by plaintiffs during discovery, and this infraction surfaced during trial. Consequently, the Court ordered Oxy to immediately produce the information, and it was produced the following day. Now, Oxy argues for the first time that it was prejudiced by this requirement, but Oxy's wound was self-inflicted. Oxy argues that it was the Court's change of position on the timing of submission of damage evidence to the jury that resulted in a lack of preparation to present evidence of its net worth. However, as detailed above, the Court deferred examining punitive damages with regard to Oxy's motion in limine until after a prima facie liability determination. Therefore, it was Oxy's decision to not comply with plaintiffs' discovery request on a reasonable basis that led to the vexation from which Oxy now claims it is afflicted. It is disingenuous in a trial of this magnitude for Oxy to feebly argue that its total lack of preparation to present evidence on punitive damages hinged on a ruling that the Court expressly stated that it did not have enough information on which to make a decision. Significantly, upon hearing the Court's ruling, Oxy did not request a continuance or make any other attempt to cure the alleged prejudice. *See Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.,* 571 F.2d at 1154–55 (an appellant may not complain of errors that the appellant induced or invited).

Oxy's stratagem backfired, and any resultant damage was aggravated by Oxy's decision not to introduce any other evidence at trial with regard to its net worth, nor even address the issue during closing arguments. Oxy must now live with the consequences of its choices. *See Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d at 373–74 (it is defendant's burden to produce evidence of its financial worth and failure to do so does not warrant reduction of punitive damages). The trial, which spanned three weeks, was not merely a dress rehearsal for Oxy to correct defects in its trial strategy that went awry.

In consideration of the defendant's net worth, the Court concludes that a substantial sum of punitive damages is reasonably necessary to deter future misconduct of this particular defendant. In this light, *under all of the circumstances of this case,* and *in this particular context* $30 million is still well short of the line of being such an extreme result as to jar this

Court's constitutional sensibilities. *See Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. at ——, 111 S.Ct. at 1043, *cited in, Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.,* 88 Md.App. 672, 708–09, 596 A.2d 687, 705 (Md.Ct.Spec.App.1991); *Spaeth v. Union Oil Co.,* 710 F.2d at 1460 ("Absent an award that shocks the judicial conscience, the jury's determination of punitive damages is inviolate.").

b. *Finding of a Lack of Excessiveness.*

■ In *Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. at ——, 111 S.Ct. at 1046, there was an award of $4,000 in actual damages for the deprivation of benefits under a life insurance policy, and the ratio to punitive damages was 1:4; however, the Supreme Court also made an effort to note that the actual out-of-pocket expenses for purchasing the insurance compared to the punitive damages award approached a ratio of 1:200. Regarding these ratios the Supreme Court stated that "[w]hile the monetary *comparisons* are wide, and indeed, may be close to the line, the award here did not lack objective criteria." *Id.* (emphasis supplied). However, the Supreme Court wisely refused to find a "mathematical bright line" test of constitutionality. *Id.* —— U.S. at ——, 111 S.Ct. at 1043. The Supreme Court correctly did not set forth an arbitrary rule of proportionality, and *expressly limited its review of the constitutionality of damages to the facts of the case before it. See Heideman v. American Family Ins. Group,* 163 Wis.2d at 866–67, 473 N.W.2d at 22 (citing *Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. at ——, 111 S.Ct. at 1043). The Supreme Court emphasized:

"We need not, and indeed, we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus."

*Oberg v. Honda Motor Co. Ltd.,* 108 Or. App. 43, 51, 814 P.2d 517, 522 (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* ——

U.S. at ——, 111 S.Ct. at 1043) (emphasis omitted), *review granted,* 312 Or. 525, 822 P.2d 1194 (1991); *see generally,* Francis M. Dougherty, Annotation, *Excessiveness or inadequacy of punitive damages in cases not involving personal injury or death,* 35 A.L.R.4th 538, 598–607 (1985) & Supp. at 53–56 (1991) (Interference with business or business rights.).

A careful scrutiny of the ratio of actual damages to punitive damages is an objective starting point for determining the waterline of excessiveness, but a close ratio does not necessarily prove adequate in cases such as this one that are marked by extraordinary circumstances. *See Garland Coal & Mining Co. v. Few,* 267 F.2d 785, 791 & n. 7 (10th Cir.1959) ("While exemplary damages must bear some relation to the injuries inflicted and the cause thereof, they do not necessarily bear any relation to the amount of damages allowed by way of compensation."). The limitations of the ratio litmus test are well illustrated by the following example that was expounded by the Alabama Supreme Court; that court considered a case after it was remanded by the United States Supreme Court in light of *Pacific Mutual,* which in turn had reviewed the seminal Alabama case—*Green Oil Co. v. Hornsby,* 539 So.2d 218 (Ala.1989):

A constitutionally permissible punitive damages award against a wealthy defendant, who engages in egregious conduct that fortuitously does little real harm but has the potential to do great harm, might involve a greater ratio of punitive damages to compensatory damages than that in this case. In contrast, a constitutionally permissible punitive damages award against a poor defendant, whose reckless conduct causes great actual harm but has little potential to cause other harm, might require a lower ratio of punitive to compensatory damages than that in this case. We find no compelling reason to set an arbitrary mathematical relationship between compensatory and punitive damages. *Imposing such a relationship would inevitably result in injustice, and we decline to impose it.*

*Southern Life & Health Ins. Co. v. Turner,* 586 So.2d 854, 858 (Ala.1991) (emphasis added).

There is certainly no assertion here that the amount of the award is excessive in the sense that it represents too large a portion of Oxy's net worth or that Oxy is unable to pay the judgment. In the present suit the actual damages award was $269,000, and the punitive damages award was $30 million, thus the ratio was more than 1:111. Plaintiffs contend that this amount is less than 1% of Oxy's net worth of $6 billion in 1989, and the Court is impressed by plaintiffs' analogy that, placed in proper perspective, the award is akin to a $1,000 award against a company that has a net worth of $100,000. *See Cash v. Beltmann N. Am. Co.,* 900 F.2d 109, 111 & n. 3 (7th Cir.1990). One benchmark of excessiveness is whether the award is a "dangerous financial drain." *Id.; Thiry v. Armstrong World Indus.,* 661 P.2d 515, 518 (Okla.1983). There is no evidence before this Court, nor even the shadow of an inference, that Oxy will be seriously marked by its punishment.

Oxy argues that the ratios have been high in some cases but "relatively small in absolute terms." Oxy's reply brief at 4 (June 14, 1991); *compare, e.g., Timmons v. Royal Globe Ins. Co.,* 653 P.2d 907, 909, 919 (Okla.1982) (1:44 ratio approved—$1.5 million award), *appeal after remand,* 713 P.2d 589 (Okla.1985); *Spaeth v. Union Oil Co.,* 762 F.2d 865, 866 (10th Cir.1985) (upholding ratio of 1:114—$2 million award), *cert. denied,* 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986); *Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356, 1366 (10th Cir.1987) (ratios of 1:50,000 and 1:50 upheld—$50,000 and $25,000 respective awards); *Jones v. Lennington,* 629 P.2d 805, 807 (Okla.Ct.App.1981) (noting in dictum that a ratio of 1:1 million might be permissible under particularly intolerable circumstances) *with Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152, 1156, 1177 (10th Cir.1981) (on rehearing en banc) (ratio of 1:3 found to be excessive—$2 million award approved), *cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). But from the angle of justice, the Court submits that punitive damages in this case should avoid being "relatively small in absolute terms." The ratio of 1:111 in this case hopefully has significant meaning in absolute terms with relation to Oxy's wealth—and well it should.

The Court has scrutinized the proportionality of the actual damages to that of the amount of punitive damages in the instant case and does not find the award to be excessive. In *Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d at 1384, there was a 1:500 ratio between the actual damages award and the punitive damages award of $500,000. In affirming the judgment following remand from the Supreme Court in consideration of *Pacific Mutual,* the Fifth Circuit reasoned that the award was one third of one percent of defendant's net worth, and "[o]ne of the *fundamental* purposes of punitive damages is to deter a wrongdoer from future misconduct." 934 F.2d at 1384 (emphasis supplied); *cf. Mason v. Texaco, Inc.,* 948 F.2d at 1561 (The Tenth Circuit ordered a remittitur of $12.5 million of a $25 million award under the peculiar circumstance that a prior jury had not awarded even one cent in punitive damages.). The Due Process Clause does not require punitive damage awards to be ineffectual and impotent. *See Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d at 1384; *see also Southern Life & Health Ins. Co. v. Turner,* 586 So.2d at 858 (affirming trial court's acceptance of award of $499,000 with a ratio of 1:499 following the Supreme Court's remand in light of *Pacific Mutual*).

Under Oklahoma law, punitive damages are awarded to punish the wrongdoer, and therefore "Oklahoma does not require the amount of punitive damages to be in a particular ratio to the amount of actual damages." *Buzzard v. Farmers Ins. Co.,* 824 P.2d 1105, 1115 (Okla.1991) (filed subsequent to, but not discussing, *Pacific Mutual*). Instead, the focus is on the harm that defendant's conduct caused to society; however, the Court may take the amount in actual controversy into account in determining the correctness of the punitive damage award. *Id.; accord Silkwood v. Kerr–McGee Corp.,* 769 F.2d at 1460 (under Okla-

homa law the factors to be considered for assessing the excessiveness of a punitive damages award are risk of wrongful conduct, and deterrent effect; and although no proportionality is required, the analysis is not open-ended as there must be a relationship to the injuries actually suffered by plaintiff and to society as a whole).

Oxy is correct that the damage award is large, but Oxy is incorrect that it is too large *under the circumstances of this case.* Punitive damages should be more than a nuisance; in the proper instance they must leave marks. *See Thiry v. Armstrong World Indus.,* 661 P.2d at 518 (the punishment function of punitive damages should sting); *Oller v. Hicks,* 441 P.2d at 360 (The jury's verdict will not be lightly interfered with in consideration of a claim of excessiveness).

## V. CONCLUSION

The elaborate and labor-intensive procedures set forth above adequately satisfy Oxy's right to all the process that is due. Oxy's conduct was certifiably reprehensible. This Court found as much by clear and convincing evidence before the jury even retired to deliberate on the evidence. A substantial award of punitive damages was necessary in this case in order to have a deterrent effect on a megacorporation of Oxy's stature. While the sum is indeed substantial, it does not exceed the amount necessary to accomplish the meritorious goals of punishment and deterrence. Any lesser sum would sacrifice justice and fair play in the cost/benefit analysis of the business community and would jeopardize the democratic ideal of a robust free-enterprise system. For all of the above reasons, the judgment shall stand. Therefore, no basis to alter or amend the judgment is presented.

Accordingly, defendant Oxy USA, Inc.'s motion to alter or amend judgment, for remittitur, for judgment as a matter of law or for a new trial is DENIED.

IT IS SO ORDERED.